570 A.2d 395

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
SHELDON JOHNSON, DEFENDANT–APPELLANT.

Argued October 24, 1989—Decided February 15, 1990.

12

Roxanne J. Gregory, Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney; *Roxanne J. Gregory* and *Richard M. Dunlevy,* Assistant Deputy Public Defender, on the brief).

*Elizabeth Miller–Hall,* Assistant Prosecutor, argued the cause for respondent (*Herbert H. Tate, Jr.,* Essex County Prosecutor, attorney).

*Anne M. Patterson,* Special Assistant to the Attorney General, argued the cause for amicus curiae, Attorney General (*Peter N. Perretti Jr.,* Attorney General of New Jersey, attorney); *Mildred Vallerini Spiller,* Deputy Attorney General, of counsel and on the brief.

The opinion of the Court was delivered by

POLLOCK, J.

The companion case, *State v. Jabbour*, holds that the presumption of imprisonment for first- and second-degree offenses applies to a defendant who commits a sex offense unless the circumstances of the offender are so extraordinary and unanticipated that imprisonment would not serve the legislative purposes of punishment and deterrence. 118 *N.J.* 1, 6, 570 *A.*2d 391. In *Jabbour*, we further held that defendant's physical and psychiatric condition did not distinguish him from other sex offenders and that imprisonment would not be a serious injustice that overrode the need to deter such conduct by others. *Id.* at 8–9, 570 *A.*2d at 394–395. We likewise reject the claim of defendant, Sheldon Johnson, a deaf drug addict who sodomized his stepdaughter, that his imprisonment would be a serious injustice.

In a plea agreement, defendant pled guilty to two counts of first-degree aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2a(1). The State agreed to recommend that defendant's conviction be downgraded to a second-degree offense for sentencing purposes and that any term of incarceration should not exceed ten years. Finding that imprisonment would be a serious injustice, the trial court sentenced defendant to two concurrent five-year probationary terms. On the State's appeal, the Appellate Division vacated the sentence, holding that a non-custodial penalty would be inappropriate under these circumstances. We affirm.

–I–

Defendant and his wife, who are both deaf, have two children by their marriage. Mrs. Johnson also has two other children, including the victim, from a previous marriage. On two occasions between 1984 and 1986, when his stepdaughter was between seven and nine years of age, defendant sodomized her. On another occasion during that same time period, he forced her to submit to cunnilingus. Defendant claims that he com-

mitted these acts when his wife refused to have sexual relations with him because she was angry at his continuing drug use.

At the sentencing hearing, the trial court found a number of mitigating factors: defendant had no history of prior criminal conduct, *N.J.S.A.* 2C:44–1b(7); his conduct was the result of circumstances unlikely to recur, *N.J.S.A.* 2C:44–1b(8); he was unlikely to commit another offense, *N.J.S.A.* 2C:44–1b(9); and imprisonment would impose excessive hardship on him and his family, *N.J.S.A.* 2C:44–1b(11). In contrast, the court found only one aggravating factor, the need for deterrence. *N.J.S.A.* 2C:44–1a(9). Clearly convinced that the mitigating factors substantially outweighed the aggravating factor and that the interest of justice so demanded, *N.J.S.A.* 2C:44–1f(2), the court accepted the State's recommendation and sentenced the defendant as if the offense were a crime of the second degree. Such offenses are subject to a sentencing range of five to ten years and a presumptive term of seven years. *N.J.S.A.* 2C:43–6a(2) and 2C:44–1f(1)(c). The court found that imprisonment would be inappropriate and sentenced defendant to five years' probation, conditioned on defendant's attendance at: (1) the access program for the deaf at Barnert Hospital; (2) an out-patient drug- and alcohol-treatment program; and (3) out-patient psychiatric counselling, if so ordered by his probation officer. The court also ruled that defendant could not reside in the same house with the victim.

Although the trial court decided against incarceration, it acknowledged: "I'm frank to admit that it's a close question as to whether or not the imprisonment of Mr. Johnson would be a serious injustice which overrides the need to deter such conduct by others." The court, however, concluded:

> Because I'm satisfied that Mr. Johnson needs, by his own admission, help; that he has been seeking appropriate help; that to remove now the opportunity for him to obtain and to continue with appropriate therapy might in the long run do more harm than good, I am of the opinion that his imprisonment at this time would be a serious injustice * * *.

In an unreported opinion, the Appellate Division reversed, concluding that even if all the mitigating factors were accepted as established, a non-custodial penalty was inappropriate. The court further found that defendant's deafness did not distinguish him from other similarly-situated defendants or excuse him from imprisonment. We agree.

## –II–

■ Like *Jabbour, supra,* 118 *N.J.* 1, 570 *A.*2d 391, this case implicates both the relative roles of trial and appellate courts in sentencing decisions and the obligation of the judiciary to adhere to the Legislature's sentencing guidelines. An appellate court may not substitute its judgment for that of the trial court, *State v. O'Donnell,* 117 *N.J.* 210, 564 *A.*2d 1202 (1989), but it may review a sentence to determine if the trial court violated the sentencing guidelines, *State v. Roth,* 95 *N.J.* 334, 364–65, 471 *A.*2d 370 (1984). As in *Jabbour,* we find that the trial court did not comply with those guidelines.

■ Under the New Jersey Code of Criminal Justice (the Code), all first- and second-degree offenses are subject to a presumption of imprisonment. The relevant statute provides:

The court shall deal with a person who has been convicted of a crime of the first or second degree by imposing a sentence of imprisonment, unless, having regard to the character and condition of the defendant, it is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others.

[*N.J.S.A.* 2C:44–1d.]

Although the judiciary possesses a "residuum of power" to overcome the presumption of imprisonment, that power is severely limited. *Jabbour, supra,* 118 *N.J.* at 5, 570 *A.*2d at 392; *Roth, supra,* 95 *N.J.* at 358, 471 *A.*2d 370. By channeling judicial discretion through the sentencing provisions of the Code, the Legislature sought to encourage uniformity in sentencing. *State v. Hodge,* 95 *N.J.* 369, 375, 471 *A.*2d 389 (1984). The Code achieves this goal by focusing on the offense, rather than the offender. *Id.* at 375, 471 *A.*2d 389. Because severity

of the offense is the most important factor in sentencing, *Roth, supra*, 95 *N.J.* at 367, 471 *A.*2d 370, the presumption of imprisonment can be overcome only in " 'truly extraordinary and unanticipated circumstances.' " *Id.* at 358, 471 *A.*2d 370 (quoting *Fair and Certain Punishment, Report of the Twentieth Century Fund Task Force on Sentencing* 21 (1976)). Such circumstances rarely exist. *Compare Jabbour, supra*, 118 *N.J.* 1, 570 *A.*2d 391 (remanding for resentencing where defendant convicted of second-degree sexual assault was sentenced to five years' probation on the grounds that imprisonment would not constitute a "serious injustice") *with State v. Jarbath*, 114 *N.J.* 394, 409, 555 *A.*2d 559 (1989) (holding that because the mentally-retarded female defendant would suffer "hardship and privation greatly exceeding that which would be accepted and endured by ordinary inmates," incarceration would be a serious injustice).

–III–

As the Appellate Division concluded, defendant has not shown that imprisonment would cause him a serious injustice outweighing the need for general deterrence. With the exception of his deafness, the mitigating factors found by the trial court are nearly identical to those found insufficient to overcome the presumption of imprisonment in *Roth* and *Hodge.*

The defendant in *Hodge* pled guilty to aggravated sexual assault after forcing his stepdaughter to engage in intercourse. The trial court imposed a sentence of sixty-three days in jail and five years' probation. It found as mitigating factors that defendant was a first offender; that his conduct was the result of circumstances unlikely to recur; that he was likely to respond favorably to probationary treatment; that he was employed, enjoyed a good reputation among his peers, and supported his family; and that incarceration would impose excessive hardship because he was supporting the family. *Hodge, supra*, 95 *N.J.* at 372, 471 *A.*2d 389. We reversed and remand-

ed for resentencing because "the [trial] court concentrated in good measure upon the defendant, rather than focusing on the gravity of the offense." *Id.* at 376, 471 *A.*2d 389.

■ In the present case, the Appellate Division correctly refused to permit defendant's drug and alcohol problems to justify a non-custodial sentence. We rejected similar arguments in *Roth:*

> [E]ven granting the trial court's conclusion that his case was "much more difficult than some," he is not the truly exceptional defendant or one caught up in a maelstrom of "engulfing circumstances." It is unfortunate, but not exceptional, that his youthful dependence on drugs and alcohol triggered his criminal behavior. Many crimes arise out of drug and alcohol use. His situation, while regrettable, is not rare.
>
> [95 *N.J.* at 368, 471 *A.*2d 389 (citation omitted).]

■ We likewise reject defendant's argument that his deafness exempts him from imprisonment. The Code makes no exception for sex offenders who cannot hear. Even when they commit crimes, the handicapped should be treated like other members of society. To treat the deaf as "different" or "extraordinary" would conflict with the goal of equal treatment.

Criminals who are blind, deaf, paralyzed, or otherwise handicapped are frequently sent to prison. Doubtless their handicaps pose special problems for them and their custodians. The solution, however, is not as the dissent concedes, *post* at 33, 570 *A.*2d at 408, to impose on deaf offenders sentences that "differ in length or severity from the sentences received by hearing offenders." Tucker, *Deaf Prison Inmates: Time to be Heard,* 22 *Loy. L.A.L.Rev.* 1, 14 (1988). Rather, "[t]he ultimate solution of the problem * * * lies in equalizing—to the extent practicable—the conditions of confinement for deaf and hearing offenders." *Id.* at 14.

We recognize that because of his hearing impairment, prison life will be harder for defendant than for hearing prisoners. No showing has been made, however, that the prison system cannot handle the problems of deaf offenders. Indeed, the Attorney General assures us that the system can accommodate

defendant. After oral argument, Gary J. Hilton, Jr., the Assistant Commissioner for Adult Institutions of the State of New Jersey Department of Corrections, submitted an affidavit reciting that "[t]he Department of Corrections has custody of a number of inmates who suffer from physical handicaps." Those inmates include twenty-four who are hearing-impaired, seven who are legally blind, twenty-two who are partially paralyzed, and fourteen others who require kidney dialysis. The Assistant Commissioner averred further that "if an inmate's physical or psychological condition necessitates special consideration, or particular problems arise in the course of his incarceration, the Department makes appropriate custodial arrangements." We trust that those arrangements will include, when necessary, providing an interpreter and other services to accommodate defendant's hearing impairment.

Our dissenting colleague apparently agrees that the trial court could have imposed a custodial sentence on defendant. *Post* at 21, 570 *A.*2d at 401. According to the dissent, however, the non-custodial sentence should be sustained as a "permissible exercise of the sentencing court's limited discretionary power * * *." *Ibid.* To sustain that result, the dissent ignores a cardinal rule of sentencing under the Code: the sentence must focus on the offense, not the offender. *Roth, supra,* 95 *N.J.* at 355, 471 *A.*2d 370; *Hodge, supra,* 95 *N.J.* at 376–77, 471 *A.*2d 389. Instead of following that rule, the dissent emphasizes defendant's personal history. To that extent, the dissent contravenes the legislative intent. *Hodge, supra,* 95 *N.J.* at 376, 471 *A.*2d 389. Through maximum and minimum sentences, *N.J.S.A.* 2C:43–6a and –6b; presumptive sentences, *N.J.S.A.* 2C:44–1f(1); specific aggravating and mitigating factors, *N.J. S.A.* 2C:44–1a and –1b; and other guidelines, the Legislature has constrained judicial discretion. See *Jabbour, supra,* 118 *N.J.* at 5–6, 570 *A.*2d at 392–393. Although a sentencing court may receive personal information about the defendant's background, particularly when he or she has been convicted of a sex

offense, that information should not divert the court from its obligation to follow the sentencing guidelines.

By emphasizing "the impact of imprisonment on a defendant's dependents," *post* at 26, 570 *A.*2d at 404, the dissent contradicts the plain language of the guidelines. Whatever merit lies in the dissent's proposed standard, the Code does not state that courts, when determining whether the presumption of imprisonment has been overcome, may consider a defendant "in combination with his or her dependents." *Post* at 31, 570 *A.*2d 406. Rather, the effect of imprisonment on a defendant's family is expressly included as a mitigating factor to be weighed when determining the appropriate sentence. *N.J.S.A.* 2C:44–1b(11) provides that one mitigating factor is whether "the imprisonment of the defendant would entail excessive hardship to himself or his dependents." The "serious injustice" exception to the presumption of imprisonment does not contain a comparable provision. Instead, the exception states that a sentencing court should consider "the character and condition of the defendant." *N.J.S.A.* 2C:44–1d. Unlike the mitigating factor contained in *N.J.S.A.* 2C:44–1b(11), the "serious injustice" exception makes no reference to the defendant's dependents. This is not to say that a court may never consider the effect on dependents. In an extreme case, the effect on a dependent could relate to the "character and condition of the defendant." If, for example, a close family member were a quadriplegic totally dependent on the defendant, a sentencing court could consider that fact. The present case is more mundane. Notwithstanding his deafness, Johnson is not an "idiosyncratic" defendant, whose "condition" prevents his incarceration from deterring others. *Jarbath, supra,* 114 *N.J.* at 408, 555 *A.*2d 559. Removing him as a wage earner may cause hardship to his family, just as the removal of the primary wage earner would cause hardship to the families of many other defendants. Whatever merit lies in considering such economic hardship, the Code does not include it as an item for consideration when determining whether incarceration would be a "serious injustice."

■ Although a court should weigh the impact of imprisonment on a defendant against the need for deterrence, such "exercises of discretion by a sentencing court," *post* at 32, 570 *A*.2d at 407, are tightly circumscribed. To overcome the presumption, the court must find that imprisonment would be a serious injustice overriding the need for deterrence. *Jabbour, supra,* 118 *N.J.* at 7, 570 *A*.2d at 393. In all but the rare case, as the dissent acknowledges, *post* at 34, 570 *A*.2d at 408, imprisonment will meet that need. *Ibid.; Jarbath, supra,* 114 *N.J.* at 408, 555 *A*.2d 559.

The judgment of the Appellate Division is affirmed, and the matter is remanded to the Law Division for resentencing.

STEIN, J., dissenting.

In *State v. Roth,* 95 *N.J.* 334, 471 *A*.2d 370 (1984), this Court eloquently declared its commitment to respect the independent exercise of sentencing discretion by a trial judge who follows the principles of the New Jersey Code of Criminal Justice (the Code):

> Pronouncement of judgment of sentence is among the most solemn and serious responsibilities of a trial court. No word formula will ever eliminate this requirement that justice be done. There is no room for trial or appellate courts to consider the public perceptions of sentences: "Judicial recognition of or action upon public opinion against a particular defendant cannot be tolerated in our criminal justice system." *State v. Humphreys,* 89 *N.J.* 4, 15 [444 *A*.2d 569] (1982). We are confident that our judges are people of "fortitude, able to thrive in a hardy climate." *Craig v. Harney,* 331 *U.S.* 367, 376, 67 *S.Ct.* 1249, 1255, 91 *L.Ed.* 1546, 1552 (1947). Our new Code reflects a delicate balance between discretion and fixed sentencing. An independent judiciary is its fulcrum. When conscientious trial judges exercise discretion in accordance with the principles set forth in the Code and defined by us today, they need fear no second-guessing. *Humphreys,* 89 *N.J.* at 16 [444 *A*.2d 569]. [95 *N.J.* at 365, 471 *A*.2d 370.]

In imposing a non-custodial sentence on this defendant, the trial court adhered scrupulously to the Code's sentencing guidelines, *id.* at 364, 471 *A*.2d 370; competent credible evidence supported its findings of aggravating and mitigating factors. *Ibid.* The sentence was not so clearly unreasonable as to shock the judicial conscience. *Id.* at 364–65, 471 *A*.2d 370. Nevertheless, retreating from its commitment in *Roth,* the Court affirms the

judgment of the Appellate Division remanding the matter for imposition of a custodial term. Without expressing any view on the soundness of the trial court's non-custodial sentence, I would sustain it as a permissible exercise of the sentencing court's limited discretionary power not to imprison in the exceptional case in which "the human cost of deterrence * * * is too great." *Id.* at 358, 471 *A.*2d 370 (quoting *State v. Harris,* 70 *N.J.* 586, 596, 362 *A.*2d 32 (1976)).

## I.

In May 1986 defendant pled guilty to two counts of first-degree aggravated sexual assault on M.C., his nine-year-old stepdaughter, *N.J.S.A.* 2C:14-2. Under the terms of the plea agreement, the State agreed to dismiss a third count of endangering the welfare of a child, a third-degree offense, *N.J.S.A.* 2C:24-4, and to recommend that the court sentence defendant on the aggravated-sexual-assault counts to a term appropriate for a second-degree offense. See *N.J.S.A.* 2C:44-1f(2) (authorizing sentence appropriate for crime one degree lower than crime for which defendant is convicted if justice demands and court is clearly convinced that mitigating factors substantially outweigh aggravating factors). The State also recommended that defendant be sentenced to consecutive terms not to exceed five years on each count, or to concurrent terms not to exceed ten years. However, at the sentencing hearing the State qualified its recommendation, stating:

[W]e're not asking for the maximum. We're not asking for 10 years. But the State believes that a period of incarceration is necessary in this case.

Testimony presented at the sentencing hearing revealed that defendant, who was born deaf, had been a victim of sexual abuse as a child. He was graduated from the Marie Katzenbach School for the Deaf in 1971. Apart from this offense, defendant had no prior criminal record, adult or juvenile. He married the victim's mother in 1981. Defendant and Mrs. Johnson have two children: a daughter, age four, and a son, age two. In addition, Mrs. Johnson has two children from her

prior marriage: an eight-year-old son and the nine-year-old victim. Mrs. Johnson is also deaf, as are two of the children.

Defendant had been employed by a decorating company as an upholsterer for the past ten years. His employer testified at the hearing that he was a conscientious employee who was willing to work overtime to provide for his family. His employer observed that defendant's relationship with his children was "joyful and happy, * * * laughing and friendly. It seems to be a very good relationship."

Mrs. Johnson testified that she had ceased sexual relations with defendant to "make him quit taking drugs." She also testified that defendant

works very hard, two jobs and always buying food for myself and the children; and always spending his time with the children at home after work, teaching the children everything; and takes myself and the children on trips; and supporting my two children because their real father never took care of them, my naturally [sic] children.

And I really am thankful to him for all the support he's given me, and I still want him back together with the family as soon as possible.

Other witnesses at the sentencing hearing included the pastor of Saint Matthews Lutheran Church for the Deaf in North Newark, who testified to the defendant's acknowledgment of his guilt, his willingness to accept punishment, and his concern for the welfare of his family; and defendant's brother and brother-in-law, both of whom testified to the close relationships between defendant's family and their respective families. The trial court also acknowledged receipt of letters from the victim and from defendant's stepson asking that defendant be allowed to rejoin the family. Relatives, friends, and co-workers submitted approximately eighteen additional letters to the court on defendant's behalf.

A report from the Adult Diagnostic and Treatment Center concluded that defendant's conduct was not "characterized by a pattern of repetitive, compulsive behavior * * *." See *N.J.S.A.* 2C:47–3a. Dr. Trotte, a mental-health clinician with the Access Program for the Deaf at Barnert Hospital in Paterson, and Dr. Martin Krupnick, a clinical psychologist, also submitted reports

to the court. Dr. Krupnick recommended marriage counseling for defendant and his wife, individual therapy for defendant, as well as drug and alcohol evaluation and treatment, if necessary. The trial court observed that defendant and Mrs. Johnson had begun marriage counseling and that defendant had commenced individual therapy. In response to the court's questions concerning psychological counseling for the victim, defendant represented that M.C. was to begin counseling the following week. Defendant's Appellate Division appendix includes a post-sentence report dated October 26, 1987, from M.C.'s psychologist concluding that defendant's incarceration would be contrary to M.C.'s best interests.

After the presentation of testimony, the trial court found the need for deterrence as an aggravating factor. *N.J.S.A.* 2C:44–1a(9). The court found a number of mitigating factors: defendant had no history of prior delinquency or criminal activity, *N.J.S.A.* 2C:44–1b(7); his conduct resulted from circumstances unlikely to reoccur, *N.J.S.A.* 2C:44–1b(8); defendant's character and attitudes indicate that he is unlikely to commit another offense, *N.J.S.A.* 2C:44–1b(9); and imprisonment would cause excessive hardship on defendant and his family, *N.J.S.A.* 2C:44–1b(11). Observing the statutory guidelines, the trial court initially accepted the State's recommendation that defendant be sentenced as if the offense were a crime of the second degree, stating that it was clearly convinced that the mitigating factors substantially outweighed the aggravating factors and that the interest of justice so demanded. *See N.J.S.A.* 2C:44–1f(2).

Nevertheless, the trial court imposed a non-custodial sentence on the defendant, specifically concluding that imprisonment "would be a serious injustice which overrides the need to deter such conduct by others." *See N.J.S.A.* 2C:44–1d. The court sentenced defendant to five years of probation, conditioned on defendant's (1) continued participation in counseling at Barnert Hospital's Access Program for the Deaf; (2) participation in an out-patient drug- and alcohol-treatment program; and (3) receiving out-patient psychiatric counseling, if ordered by his

probation officer. The court also prohibited any visitation between defendant and the victim until further order of the court. Defendant had moved out of the marital home prior to the plea hearing.

In the course of imposing sentence, the trial court referred to various factors that influenced its determination:

The imprisonment of Mr. Johnson would entail some degree of hardship to himself and his family. He apparently is still supporting his family financially, and this Court is very concerned, not only about the victim, it's concerned about the relationship among the various parties in this family. It's concerned about what the future holds, if anything, for this family.

\* \* \* \* \* \* \* \*

Because I'm satisfied that Mr. Johnson needs, by his own admission, help; that he has been seeking appropriate help; that to remove now the opportunity for him to obtain and to continue with appropriate therapy might in the long run do more harm than good, I am of the opinion that his imprisonment at this time would be a serious injustice which overrides the need to deter such conduct by others.

\* \* \* \* \* \* \* \*

I sincerely believe, Mr. Johnson, that you can make a go of your life from this point forward. I believe you're sincere in your remorse. I believe you're sincere in your desire to recognize and to cope with and to overcome your various problems.

You have a loving family and friends many of whom appear here today to speak on your behalf, others of whom have written [ ] letters which were presented to this Court today.

The trial court acknowledged great difficulty in reaching its decision, and recognized that a non-custodial sentence for defendant constituted an exceptional exercise of the court's discretionary authority:

I'm frank to admit that it's a close question as to whether or not the imprisonment of Mr. Johnson would be a serious injustice which overrides the need to deter such conduct by others.

\* \* \* \* \* \* \* \*

I'll say it again because that's how deeply I feel about it. This has been the most difficult sentence that this Court has had to impose since I assumed the bench. I have thought long and hard about this matter. I hope I made the right decision, but I have the same feeling every time I impose sentence.

\* \* \* \* \* \* \* \*

You're placed on probation by this Court for five years. I've attached certain conditions to the probation. The State of New Jersey has 10 days within which to decide whether or not to appeal this sentence, *because this is not an ordinary sentence. This is a sentence which I believe is rarely employed [but] which I firmly believe is appropriate in this case.* [Emphasis added.]

The Appellate Division reversed in an unreported opinion, concluding that the criteria for a non-custodial sentence established in *Roth, supra,* 95 *N.J.* 334, 471 *A.*2d 370, and *State v. Hodge,* 95 *N.J.* 369, 471 *A.*2d 389 (1984), had not been satisfied. The court determined that defendant's deafness did not distinguish him from other similarly-charged defendants.

## II.

The majority's analysis begins with the acknowledgment that the Code confers on sentencing judges a "residuum of power" to overcome the presumption of imprisonment for first- and second-degree crimes. *Ante* at 15, 570 *A.*2d at 398. The Code provides:

The court shall deal with a person who has been convicted of a crime of the first or second degree by imposing a sentence of imprisonment unless, having regard to the character and condition of the defendant, it is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others. [*N.J.S.A.* 2C:44–1d.]

The majority characterizes the power as extremely limited, and exercisable only in "truly extraordinary and unanticipated circumstances." *Ante* at 16, 570 *A.*2d at 398 (quoting *Roth, supra,* 95 *N.J.* at 358, 471 *A.*2d 370 (quoting Fair and Certain Punishment, Report of the Twentieth Century Fund Task Force on Sentencing 21 (1976))) (hereinafter Fair and Certain Punishment). The majority states that such circumstances "rarely exist," *ante* at 16, 570 *A.*2d at 398, and could exist only in the case of an "idiosyncratic" defendant. *Ante* at 19, 570 *A.*2d at 400 (citing *State v. Jarbath,* 114 *N.J.* 394, 408, 555 *A.*2d 559 (1989)).

Our opinions have not clearly delineated for trial courts the circumstances in which the "serious injustice" standard may permissibly be invoked. In *Roth,* Justice O'Hern referred to the "exceptional case" in which "the human cost of such deterrence * * * is too great." 95 *N.J.* at 358, 471 *A.*2d 370

(quoting *State v. Harris*, 70 *N.J.* 586, 596, 362 *A.*2d 32 (1976)). He also cited the dissenting opinion in *State v. Velazquez*, 104 *N.J.Super.* 578, 585, 250 *A.*2d 771 (App.Div.1969), aff'd o.b., 54 *N.J.* 493, 257 *A.*2d 97 (1969) (Gaulkin, J.A.D., dissenting) ("The blow to this man and his family, including his innocent children, is far more devastating than the problematical incidental damage it may do to organized gambling. * * * If this man is not entitled to probation, I do not know who could be."). *Harris* and *Velazquez* were both pre-Code cases.

In *Harris*, the jury convicted defendant of welfare fraud, and as a condition of probation the court required her to make restitution of the funds received. The amount involved was sharply disputed. This Court vacated the condition of restitution, noting that defendant was the sole source of support for her five minor children. 70 *N.J.* at 596–97, 362 *A.*2d 32. In *Velazquez, supra,* 104 *N.J.Super.* 578, 250 *A.*2d 771, a jury convicted defendant on twelve counts of an indictment charging him with working for an illegal lottery business and the court sentenced him to one-to-two years in prison. The dissent argued forcefully for a non-custodial term, contending that the sentencing court had not adequately considered the devastating impact of a prison sentence on defendant's family. *Id.* at 584–85, 250 *A.*2d 771. Thus, although neither *Harris* nor *Velazquez* involved the "serious injustice" standard of *N.J.S.A.* 2C:44–1d, *Roth*'s reference to them as illustrative of the "exceptional case" suggests the appropriateness of a standard that takes into account the impact of imprisonment on a defendant's dependents.

*State v. Jarbath, supra,* 114 *N.J.* 394, 555 *A.*2d 559, is the only Code case involving a first- or second-degree crime in which this Court has held that imprisonment would be a serious injustice sufficient to override the need for deterrence. Defendant was a mentally-retarded young woman charged with the murder of her infant son. She pled guilty to second-degree manslaughter and the court sentenced her to an indeterminate custodial term not to exceed seven years. She challenged her

sentence on appeal, in part on the basis that she had been severely abused in prison and had attempted suicide. After supplementing the record, the Appellate Division determined that it would be a "serious injustice" to continue defendant's imprisonment, noting that incarceration did not serve as a deterrent because of defendant's retardation. The court resentenced defendant to a non-custodial probationary term with appropriate conditions. In affirming that sentence, this Court observed that although the Code's general focus was "upon the gravity of the offense and not the blameworthiness of the offender," sentencing courts have a "residuum of power" to consider the "character and condition" of the defendant under *N.J.S.A.* 2C:44-1d. *Id.* at 407, 555 *A.*2d 559 (quoting *Roth, supra,* 95 *N.J.* at 355, 471 *A.*2d 370). In *Jarbath* we explained the rationale for permitting consideration of a defendant's "character and condition" in exceptional cases:

> Rather, the purpose in permitting consideration of the character and condition of the defendant under the Code would be to avoid the imposition of a sentence that goes beyond the central Code purpose of imposing proportionate sentences, that is, sentences that fit the particular crime. A disproportionate sentence would be identified by a term of imprisonment that creates a "serious injustice" that overrides the needs of general deterrence. This statutory benchmark demarks the point beyond which an otherwise proper sentence exceeds its appropriate penal objective of proportionate punishment. [*Id.* at 408, 555 *A.*2d 559 (citation omitted).]

To illustrate the rare case in which the injustice of imprisonment would override the need for deterrence, we offered as an example

> instances where the character and condition of the defendant are so idiosyncratic that incarceration or extended imprisonment for the purposes of general deterrence is not warranted. *See, e.g., State v. Gardner,* * * * 113 *N.J.* [510] [,] 520 [551 *A.*2d 981] [(1989)]; State v. Leggeadrini, * * * 75 *N.J.* [150] [,] 158 [380 *A.*2d 1112] [ (1977) ]; *State v. Ivan,* 33 *N.J.* 197, 202 [162 *A.*2d 851] (1960). This case conforms to these examples. [*Ibid.*][1]

---

[1] In *State v. Gardner, supra,* 113 *N.J.* 510, 551 *A.*2d 981, defendants, who pled guilty to third-degree arson, were volunteer firefighters without prior records. Two defendants were also first-aid-squad members and all three had led "exemplary lives." *Id.* at 520, 551 *A.*2d 981. This Court vacated the custodial sentence imposed by the trial court after determining that the presumption of

We concluded that because of her retardation, imprisonment of Ms. Jarbath would be a serious injustice that outweighed the need for deterrence. *Id.* at 409, 555 *A.*2d 559.

*State v. Daniels*, 195 *N.J.Super.* 584, 481 *A.*2d 291 (App.Div. 1984), offers another example of the "idiosyncratic" defendant described in *Jarbath.* Defendant pled guilty to a charge of first-degree robbery in the course of which he and two co-defendants stole the victim's moped, helmet, and air-pump. The trial court sentenced defendant to an indeterminate term not to exceed seven years, but observed that if not for "the *Roth* Case" (*State v. Roth, supra,* 95 *N.J.* 334, 471 *A.*2d 370) the court would have imposed a non-custodial term. *Id.* at 587, 481 *A.*2d 291.

The Appellate Division described the "character and condition" of the defendant:

> Due to traumatic injuries which he sustained at the age of five, defendant suffers from left hemiplegia, meaning that he is partially paralyzed on the left

---

non-incarceration had been overcome, and remanded for resentencing. *Id.* at 521, 551 *A.*2d 981.

In *State v. Leggeadrini, supra,* 75 *N.J.* 150, 380 *A.*2d 1112, defendant pleaded *non vult* to murder and the court sentenced him to a term of twenty-five to thirty years. Defendant had shot and killed the victim, a youthful neighbor who had argued with defendant's wife on several occasions. This Court described defendant as

> a solid member of the community [who had] enjoyed a stable family life. At the time of the criminal incident Leggeadrini was 66 years old. Prior to his retirement in 1972, he had been a productive citizen holding continuous employment at the same job for 31 years. Leggeadrini had no previous criminal record. He and his wife lived on modest pension and social security benefits which he supplemented with part-time work for the local school board. [*Id.* at 154–55, 380 *A.*2d 1112.]

We concluded that the sentence imposed was manifestly excessive in view of the crime's "strong emotional roots," *id.* at 158, 380 *A.*2d 1112 (quoting *State v. Ivan,* 33 *N.J.* 197, 202, 162 *A.*2d 851 (1960)), and reduced the sentence to a term of seven to ten years.

In *State v. Ivan, supra,* 33 *N.J.* 197, 162 *A.*2d 851, defendant was convicted of bookmaking and would not name his superior in the gambling venture. We affirmed the trial court's custodial sentence of one-to-two years although defendant had no prior convictions, was a good family man, and had a record of regular employment.

side. Additionally, he suffers frequent seizures of the grand mal type. His seizures are treated by the medication phenobarbital, although not totally controlled by this medication. The pre-sentence report states that "[i]f the Graves Act were not applicable, this writer would recommend a probation term, to include occupational therapy in a sheltered workshop." The pre-sentence report reveals that "... defendant attended A. Harry Moore Laboratory School ... and Hudson County Vo-Tech School, graduating in 1982," and that "he performed well in school." Attached to the pre-sentence report is a letter to the probation officer from the School Social Worker of the A. Harry Moore Laboratory School, expressing the opinion that a jail sentence can neither "deter or rehabilitate" defendant and stating that "[a]lthough he has had an uneven success rate with a sheltered workshop placement, I do feel strongly that he is a candidate for a rehabilitative sheltered workshop setting such as may be offered in New York City." [*Ibid.*]

The court remanded the matter to the trial court for resentencing, observing that the Code authorized the trial court to impose either a custodial or non-custodial sentence:

[W]hen a sentencing judge justifiably decides that imprisonment would be a serious injustice under the provisions of *N.J.S.A.* 2C:44–1(d), the judge need not be a computer automatically imposing a custodial sentence.

We wish to make it clear that we have not decided here that the trial judge abused his discretion when he imposed a custodial sentence upon defendant. Similarly, it would not be an abuse of discretion if the trial judge should forgo the imposition of a custodial sentence because he "... is of the opinion that his [defendant's] imprisonment would be a serious injustice which overrides the need to deter such conduct by others." *N.J.S.A.* 2C:44–1(d). Within the constraints of the statute, there is still some discretion reposed in the sentencing judge. We should not disturb the trial judge's exercise of that discretion absent a clear abuse, *State v. Roth*, 95 *N.J.* at 363 [471 *A.2d* 370] and we will not substitute our discretion for that of the trial judge. [*Id.* at 589, 481 *A.2d* 291.]

By way of comparison, *State v. Jabbour*, 118 *N.J.* 1, 570 *A.2d* 391 (1989), which we also decide today, may best be understood as a case in which the trial court applied the "serious injustice" standard to a defendant possessing no unique physical or mental condition or any other extraordinary characteristic—in short, a non-idiosyncratic defendant. Imposing a non-custodial sentence after defendant had pled guilty to second-degree sexual assault on a four-year-old girl, the trial court observed that defendant was "unfamiliar with life in the streets * * * and is in no way capable of enduring modern day prison life." *Id.* at 8, 570 *A.2d* at 394. The trial court de-

scribed defendant as a "sad, sorry, weak individual in need of psychiatric attention," and determined that "[a] period of incarceration will carry a high risk of his never overcoming his present emotional difficulties and achieving normalcy." *Id.* at 4, 570 *A.*2d at 392. We concluded that defendant was not "idiosyncratic," and that his inability to endure prison life, "while regrettable, is not rare." *Id.* at 8, 570 *A.*2d at 394 (quoting *Roth, supra,* 95 *N.J.* at 368, 471 *A.*2d 370).

*Roth* and *Hodge* are analogous to *Jabbour.* The defendant in *State v. Hodge, supra,* 95 *N.J.* 369, 471 *A.*2d 389, pled guilty to first-degree aggravated sexual assault, admitting acts of sexual intercourse with his thirteen-year-old stepdaughter over the course of a year. Defendant was an unexceptional first-offender, employed full-time, and the sole support of his wife and natural daughter. This Court reversed the trial court's sentence of five years probation and sixty-three days in jail, concluding that the trial court "relied on pre-Code sentencing guidelines" balancing "defendant's capacity for rehabilitation with the other purposes of punishment, rather than following the offense-oriented analysis of the Code." *Id.* at 378, 471 *A.*2d 389. In *State v. Roth, supra,* 95 *N.J.* 334, 471 *A.*2d 370, defendant admitted to having sexually assaulted at knifepoint a young mother accompanied by her infant child, and pled guilty to aggravated sexual assault. Tests revealed a severe alcohol dependence and a drug-abuse problem. On the day of the crime defendant had been drinking heavily and had consumed one-half of a quaalude. The trial court sentenced Roth to five years probation conditioned on attendance at Alcoholics Anonymous and participation in an in-patient rehabilitation program. Reversing the non-custodial sentence, we held that defendant's disability was not sufficiently unique, in the context of the gravity of defendant's crime, to override the need for a custodial sentence:

> But even granting the trial court's conclusion that his case was "much more difficult than some," he is not the truly exceptional defendant or one caught up in a maelstrom of "engulfing circumstances." *Leggeadrini,* 75 *N.J.* at 160 [380

A.2d 1112]. It is unfortunate, but not exceptional, that his youthful dependence on drugs and alcohol triggered his criminal behavior. Many crimes arise out of drug and alcohol use. His situation, while regrettable, is not rare. It has not been shown as to him that "the human cost * * * is too great." *State v. Harris*, 70 *N.J.* 586, 596 [362 *A.2d* 32] (1976). [*Id.* at 368–69, 471 *A.2d* 370.]

The principle of *Roth, Hodge, Jarbath, Jabbour, Daniels*, and the underlying case law on which those opinions rely, is that the "serious injustice" standard of *N.J.S.A.* 2C:44–1d should be applied only in the truly extraordinary case in which a defendant, individually or in combination with his or her dependents, possesses uncommon and exceptional physical, mental, emotional, or other characteristics that significantly distinguish that defendant from the vast multitude of defendants that confront the criminal-justice system. Concededly, such defendants are rare, and it is difficult for sentencing courts to identify them. The majority acknowledges that "in an extreme case" a sentencing court may consider the effect of incarceration on dependents in attempting to identify the "idiosyncratic" defendant to whom the serious injustice standard applies. *Ante* at 19, 570 *A.2d* at 399. But the majority reads this record too narrowly in concluding, *as a matter of law*, that the trial court perceived merely an "economic" hardship on defendant's family.

In the rare case in which a trial court has identified such a distinctive defendant, the exceptional conditions and characteristics that distinguish that defendant from others must be weighed against the gravity of the offense in order to determine whether imprisonment would be so serious an injustice as to "override the need to deter such conduct by others." *N.J.S.A.* 2C:44–1d. Only by such a weighing process, even in the extraordinary case of the idiosyncratic defendant, can a trial court determine whether the case is truly the rare one in which "the human cost of such deterrence * * * is too great." *Id.* at 358, 471 *A.2d* 370 (quoting *State v. Harris, supra*, 70 *N.J.* at 596, 362 *A.2d* 32). Both the identification of a defendant as distinctive and the collateral weighing process involve exercises of

discretion by a sentencing court in accordance with Code guidelines that should not be disturbed absent a clear abuse. *Id.* at 364, 471 *A*.2d 370.

### III.

Several factors in this case support the trial court's implicit conclusion that defendant is idiosyncratic. Defendant is deaf, his wife is deaf, and two of their children are deaf. Several witnesses, including defendant's wife, testified that he was the sole source of support for his wife, children, and stepchildren. Although defendant had been ordered to leave the marital home before the sentencing hearing, the trial court acknowledged that defendant "is still supporting his family financially" and expressed its concern "not only about the victim," but also "about the relationship among the various parties in this family. It's concerned about what the future holds, if anything, for this family."

Despite the atrocious offense that defendant committed against his stepdaughter, evidence presented at the sentencing hearing demonstrated that there remained a strong, cohesive bond among the members of the Johnsons' immediate and extended families. The court received letters not only from defendant's relatives and friends but also from Mrs. Johnson's mother and sister. The strength and solidity of the support demonstrated by the Johnson relatives undoubtedly impressed and influenced the trial court.

The literature on deafness documents the cohesiveness and interdependence among hearing-impaired people:

> Americans who lose their hearing early in life do form a distinctive social and cultural group, a society both strongly cohesive and highly endogamous. This is especially true for sign language users, but even among staunch oralists deaf from youth four out of five marry a deaf spouse rather than a hearing one. And most prevocationally deaf spend nearly all their leisure time and find their basic personal identity in the company of others like themselves. Unlike other disabled people, those who identify themselves as deaf form a true society, a genuine cultural group. [Benderly, *Dancing Without Music: Deafness in America* at 12 (1980).]

*Accord* P. Higgins, *Outsiders in a Hearing World: A Sociology of Deafness* 39 (1980); H. Furth, *Deafness and Learning: A Psychosocial Approach* 50 (1973); H. Furth, *Thinking Without Language: Psychological Implications of Deafness* 2 (1966). The trial court's expression of concern about the effect of imprisonment on defendant's family obviously reflected the court's perception of the family's vulnerability and its dependence on defendant.

As the majority correctly notes, "prison life will be harder for defendant than for hearing prisoners" because of his deafness. *Ante* at 17, 570 *A.*2d at 399. One commentator offered this hypothetical prototype of a prisoner's experience:

> Fred's days in prison were fraught with frustration and fear. He was not able to develop any real understanding of the prison ropes. He was often unable to prevent attacks against himself by other prisoners and, as an easy prey, was frequently the victim of such attacks. He was routinely taunted and tormented by many inmates and a few guards. Yet, when he defended himself, and was subsequently ordered before a disciplinary board, he was denied the right to an interpreter at the disciplinary hearing. He was labeled as "dummy" or as "deaf and dumb." Some of his fellow inmates were suspicious of his deafness, believing it to be an act, a ploy for better treatment, or an attempt to be mysterious. A couple of inmates repeatedly "tested" Fred's deafness by approaching him from behind, lighting papers on fire, and sticking them in his back pockets. In his isolation Fred did not know how to stop the attacks without worsening his situation. In desperation Fred attempted to teach one of the guards to finger spell. He was called a "rat" by some prisoners and beaten for his purported "snitching." [Tucker, *Deaf Prison Inmates: Time to be Heard*, 22 *Loy. L.A.L.Rev.* 1, 9–10 (1988) (hereafter *Deaf Inmates*).]

Nevertheless, the commentators do not advocate that deaf offenders be exempt from incarceration:

> [T]he sentences received by deaf offenders should *not* differ in length or severity from the sentences received by hearing offenders * * *. The ultimate solution * * * lies in equalizing—to the extent practicable—the conditions of confinement for deaf and hearing prisoners. [*Id.* at 14.]

In the course of the sentencing hearing, defendant's counsel noted that defendant had been "scared" while incarcerated in the county jail for three weeks after his arrest. However, the trial court did not attempt to justify its non-custodial sentence on the basis of defendant's anticipated hardship as a prison inmate. Rather, the court focused primarily on the effect of

imprisonment on defendant in the context of defendant's family relationships and responsibilities.

As *amicus*, the Attorney General argues that the Legislature's intent was to ensure the imprisonment of convicted child molesters, observing that sexual crimes against children are graded "severely" and that probationary terms for first- and second-degree crimes are "plainly inappropriate." I fully agree. Sexual offenses against vulnerable young children not only are heinous crimes, but their consequences are often devastating and permanently scar the victim. In the overwhelming majority of such cases involving first- or second-degree offenses, a custodial sentence should and will be imposed. Nevertheless, the Legislature has specifically vested trial judges with a narrow window of discretion for all first- and second-degree crimes, to impose punishment short of imprisonment in the rare case in which imprisonment would cause a serious injustice overriding the need for deterrence. I do not sense that this limited legislative grant of discretion has been abused. *See State v. Hodge*, 207 *N.J.Super.* 363, 504 *A.*2d 679 (App.Div.1986) (citing statistics from Administrative Office of the Court verifying that vast majority of comparable first-degree sex offenders receive custodial sentences). If there has been abuse, today's opinions will make crystal clear that the trial court's ambit of discretion in such cases is narrow indeed.

But in the rare case, such as this one, presenting an idiosyncratic defendant with unusually vulnerable dependents, we need not "second guess" a trial court that conscientiously and painstakingly exercises the discretion that the Legislature has ceded to it in accordance with the Code's guidelines. This Court did not hear the testimony at the sentencing proceeding or observe the demeanor of the witnesses. It should not so readily reject the assessment of the trial judge that did. *Cf. Leggeadrini, supra*, 75 *N.J.* at 162, 380 *A.*2d 1112 ("Appellate deference to the discretionary decision of a sentencing judge is similar, in purpose and origin, to that accorded decisions of a trier of fact. It is based primarily on the sentencing judge's presumed superi-

or ability to make a first-hand evaluation of the background and character of the defendant and the offense." ).

Indisputably, one of the Code's objectives was to limit sentencing variability, relying on "presumptive" sentences and limiting the role of judicial discretion. *State v. Roth, supra,* 95 *N.J.* at 353–55, 471 *A.*2d 370. But the Code vests the judiciary with "some degree of guided discretion" to deal with the particular crime and criminal. *Id.* at 358, 471 *A.*2d 370 (quoting Fair and Certain Punishment, *supra,* at 19). A sentencing system so rigid that it allows for no discretion, no variations from the ordained punishment, would be totally incompatible with our concept of justice. Although limitations on judicial discretion enhance sentencing predictability, we would not tolerate a sentencing system that lacks the capacity to be humane.

The majority's invalidation of this defendant's sentence further diminishes the already limited function of the "serious injustice" exception to presumptive incarceration. It sends a clear signal of restraint to trial courts, who will doubtless be increasingly reluctant ever to invoke the "serious injustice" exception. An unintended irony of the Court's holding is that defendant's family—which was the root of the trial court's concern—must now bear the added burden of defendant's prospective custodial sentence, almost four years after defendant's guilty plea.

I would reverse the judgment of the Appellate Division and reinstate the trial court's sentence.

*For affirmance and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HEARN and GARIBALDI—6.

*For reversal*—Justice STEIN—1.