**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4572-17T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JOSE M. LAPORTE,

      Defendant-Appellant.

_____

Submitted May 6, 2020 – Decided July 6, 2020

Before Judges Whipple and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 17-07-0746.

Joseph E. Krakora, Public Defender, attorney for appellant (John Walter Douard, Assistant Deputy Public defender, of counsel and on the briefs).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jose Laporte appeals from a March 29, 2018 judgment of conviction after a jury found him guilty of first-degree strict liability for drug-induced death, N.J.S.A. 2C:35-9(a); third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1); third-degree possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3); and third-degree distribution of a CDS, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3). We affirm his conviction.

Defendant raises the following issues on appeal:

> POINT I: EVEN WHEN VIEWED IN THE LIGHT MOST FAVORABLE TO THE STATE, THE EVIDENCE WAS INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT SOLD THE DRUGS TO SUNG U ON THE DAY OF HIS DEATH.
>
> POINT II: THE [TWELVE] YEAR NERA[1] SENTENCE IS EXCESSIVE AND THE MATTER MUST BE REMANDED FOR RESENTENCING, BECAUSE THE JUDGE PLACED GREATER WEIGHT ON GENERAL DETERRENCE THAN OUR COURTS HAVE FOUND REASONABLE, AND FAILED TO FIND MITIGATING FACTOR N.J.S.A. 2C:44-1(b) (11).

We glean the following facts from the trial record. Around 4:00 a.m. on April 12, 2017, Detective Anthony Fontana and other officers from the

---

[1] No Early Release Act, N.J.S.A. 2C:43-7.2.

Burlington Township Police Department responded to a report of a possible drug overdose. Upon entering, Fontana observed the deceased victim, Sung U Han (Sung U),[2] in his bedroom.

Sung U lived with his father Alexander Han (Alexander) in the apartment. Sung Ho Han (Sung Ho), the victim's brother, testified that the family knew about Sung U's substance abuse issues but thought he remained drug free in the months prior to his death, as he looked healthier and appeared happier after participating in a detox program.

Sung Ho testified that on April 11, 2017, Sung U helped him move furniture from approximately 10:00 a.m. to 6:00 p.m. The brothers then had dinner with Alexander at Sung Ho's house until Sung U said he needed to go home. Alexander returned to the apartment on his own, and Sung Ho drove his brother there around 9:30 or 10:00 p.m.

Alexander woke up in the early hours of the morning and noticed Sung U's bedroom door open. Alexander noticed "something odd" and shook his son's body, which was cold to the touch. Alexander called Sung Ho and they called

---

[2] We refer to the victim as Sung U, his brother Sung Ho Han as Sung Ho, and his father Alexander Han as Alexander for ease of reference, intending no disrespect to the family.

911. They noticed a "tannish bloodish" fluid coming out of Sung U's mouth and tried to administered CPR to no avail.

Officer Matthew Kochis considered administering Narcan, but it was too late. While in Sung U's bedroom, Kochis found two small wax pieces of paper with a "GUCCI" stamp, a cell phone in close proximity to Sung U's body, a hypodermic syringe filled with a substance suspected to be heroin, a lighter, and a spoon on the floor.

Fontana asked Alexander about the cell phone. Alexander explained it was Sung U's phone, however, he paid the bill, and the phone was under his name. Alexander gave consent for police to access and search the phone and an inspection revealed Sung U's phone had text messages and calls to a telephone number listed under the contact "Mainor." The text thread from that night showed at 7:12 p.m., Mainor texted, "am here." Sung U called Mainor's phone five times between 10:38 and 11:01 p.m.

Fontana believed Mainor sold Sung U the heroin that killed him, and so the following morning Fontana used Sung U's phone to contact Mainor in an attempt to purchase heroin. Fontana messaged: "Bro, that shit was fire. You around?" Mainor responded that he was not available but would be around after 2:00 p.m. After 2:00 p.m., Fontana messaged Mainor again to inquire if he or

she was around, and Mainor responded: "Go to 24, dude there." Fontana, however, did not know the location of "24" and asked Mainor to meet him near Sung U's apartment. Mainor refused and insisted they meet at "24."

Fontana continued to try to meet Mainor, under the guise that he was Sung U, asking Mainor to meet him in a parking lot in front of the apartment. Finally, Fontana and Mainor agreed to meet at a Chinese restaurant; however, Fontana did not know the location of the store as there were three Chinese restaurants near Sung U's apartment. Mainor conveyed he was on his way and messaged: "Hurry up, I got people waiting."

After failing to meet Mainor at the suggested location, Fontana stated that he was at a meat market in Burlington Township and asked for Mainor's location. Mainor responded: "The same spot as last night." After a series of miscommunications, both Fontana and Mainor agreed to meet the following day. However, Fontana opted not to initiate communication on that day, as the resources to conduct a successful operation were not available.

On April 14, 2017, via text message, Mainor and Fontana agreed to meet at Lourdes Hospital so he could purchase two bundles of the "same stuff" and Mainor responded "[o]kay." Around 11:20 a.m., Mainor and Fontana spoke on the phone because they determined there was a miscommunication regarding the

location of the meeting. Fontana and Mainor went to two different Lourdes Hospitals; Mainor went to the hospital in Camden while Fontana went to the one in Willingboro.

Eventually, they agreed to meet at a Dunkin Donuts near the Lourdes Hospital in Willingboro. The police positioned unmarked cars in the area. Fontana and Mainor continued to exchange messages when Mainor explained that he was in a Nissan. Fontana observed a silver Nissan pull into the Dunkin Donuts parking lot at approximately 12:15 p.m. and noticed there were two occupants in the car, a male driver and female passenger. The police officers approached the Nissan and detained both the driver, later identified as defendant Laporte, and the female passenger.

The officers searched defendant and found thirty bags of heroin contained in blue wax folds, packaged in two bundles, with "GUCCI" stamped in black. The officers also searched the Nissan and retrieved three cell phones from the driver's side door. Fontana described two of the phones as "burner" phones, phones with very limited capabilities such as calling and texting, and the other phone as a Samsung smartphone. Fontana testified that defendant claimed ownership of two of the phones, the Samsung phone and one of the burner phones, but did not claim the other burner phone whose number was linked to

Mainor. Extraction reports prepared by the prosecutor's office revealed seventeen contacts from the phone linked to Mainor but did not include any text messages or call logs. Sung U's phone number, however, was not one of the contacts recovered from the phone.

Detective Mark Carnivale, who participated in the operation, testified that he had the opportunity to speak briefly with defendant as he was being processed in the police station. Carnivale testified defendant was told he was being charged with strict liability for the drug-induced death of Sung U, after which defendant asked him "if his boy was really dead." In an interview two weeks after his arrest, defendant told Fontana that a man named Angel Martinez, also known as "Pika," was the "leader of the set," and "ran the block on 24."

The Burlington County Medical Examiner's Office submitted samples of both Sung U's peripheral blood and urine to NMS labs for testing. Sung U's urine and peripheral blood tested positive for opiates and cannabinoids. The Burlington County Forensic Laboratory (BCFL) also conducted tests on the contents of the syringe and two glassine bags with a blue fold paper stamped "GUCCI" recovered from Sung U's room. The laboratory performed two color tests on the syringe contents, one indicating there may be an opioid present and the other testing negative. Debera Scott, a chief forensic chemist at BCFL,

A-4572-17T3

explained the disparity between the first and second test could have resulted from the fact that there may not have been enough of the substance there. Scott testified the two glassine bags tested positive for opioids and explained further testing identified the substance as pure heroin. The lab also tested fifteen of the glassine bags recovered from defendant's person and found the substance was also pure heroin.

Burlington County's Chief Medical Examiner Dr. Ian Hood opined Sung U suffered from a pulmonary edema, "a very characteristic finding in somebody who has died acutely of an opiate reaction." Dr. Hood concluded, based on his examination, that heroin was the cause of Sung U's death.

Flor Garcia, defendant's former coworker, testified that on April 11, 2017, he met with defendant at his home in Camden to talk about repairing a vehicle. Garcia testified that from around 3:00 p.m. to 6:00 p.m. defendant was working with him to repair the car. Garcia testified that around 6:00 p.m. they drove to his house to hang out and drink beer and Garcia drove defendant back to his home around 11:15 p.m. Garcia further testified he noticed that defendant had only one touch screen phone on him at the time and the phone did not ring nor did he see defendant utilize the phone during the time he was with him.

A-4572-17T3

Defendant testified that on April 11, 2017, he was abusing heroin and that his addiction started when he was prescribed Percocet to treat an injury he sustained while landscaping. In exchange for "a bag or two" of heroin, he would collect money for local drug dealers and would then take the collected money to the owner, Angel Martinez. Defendant testified that Martinez did not sell any drugs other than heroin, and that the heroin was marked with the "GUCCI" stamp.

According to defendant, he walked to his mother's house in Camden and met with Garcia around 3:00 p.m. to discuss repairing a Jeep. Around 6:00 p.m. he finished repairing the car and went to Garcia's home in Philadelphia "to drink a couple beers." Garcia later drove him back to his home where he remained for the rest of the night.

Defendant also testified that in March 2017, Martinez gave him a Verizon flip phone. He testified the phone was for Martinez to contact him as he did not work with Martinez on a daily basis. Defendant further testified that he had only his touch screen phone with him on April 11, 2017, but carried the Verizon flip phone and his touch screen phone on both April 12 and 13. On April 14, the day he was arrested, defendant asserted Martinez gave him a black Posh phone

9

and told him that there was supposed to be someone coming by to grab the phone and some drugs.

Defendant testified that someone sent a text to the phone around 8:30 a.m. to set up a drug transaction. He denied knowing the person who texted him, a person listed in the phone as "Chino," and he never met someone with that name before. Defendant decided to meet the person who wanted the drugs so that he could keep some of the drugs for his personal use. He tied the heroin to his boxers and traveled in a Nissan to the designated location. He testified that he did not know who he was meeting at Lourdes, but when he arrived, he realized that the person he was communicating with was Fontana.

Defendant consumed heroin and smoked marijuana on the day of his arrest and attributed his question, whether "his boy was really dead," to the fact that he was high and did not "know what was going on." He denied selling drugs to Sung U and stated that the transaction leading to his arrest was the first time he tried to sell drugs.

At the end of the State's case, defendant's lawyers asked the court to dismiss the charge of first-degree strict liability for drug-induced death, N.J.S.A. 2C:35-9(a), which the judge denied utilizing the State v. Reyes, 50 N.J. 454, 458-59 (1967), standard.

The jury convicted defendant of all charges. The court sentenced defendant to an aggregate twelve-year prison term with an eighty-five percent period of parole eligibility pursuant to NERA and five years of parole supervision following his release.

This appeal followed.

I.

Defendant argues the trial court erred in denying his Reyes motion because the State failed to prove, beyond a reasonable doubt, that he provided the fatal dose of heroin. Specifically, defendant argues the State did not: 1) provide direct evidence that Sung U purchased heroin from defendant; 2) collect DNA fingerprints from Sung U's room; 3) disprove defendant's alibi; 4) investigate the possibility that Martinez sold the drugs to Sung U; and 5) produce evidence showing that defendant possessed the phone used to communicate with Sung U and Fontana on April 11, 2017.

We use the same standard as the trial judge in reviewing a motion for judgment of acquittal based on an insufficiency of the evidence. State v. Bunch, 180 N.J. 534, 548-49 (2004). We must determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable

11

jury could find guilt of the charge beyond a reasonable doubt.

[Reyes, 50 N.J. at 458-59.]

Under Rule 3:18-1, we "[are] not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

The evidence in the record, viewed in its entirety and giving the State all favorable inferences therefrom, was more than sufficient to allow a reasonable jury to warrant a conviction for strict liability for drug-induced death.

N.J.S.A. 2C: 35-9(a) provides:

> Any person who manufactures, distributes or dispenses methamphetamine, lysergic acid diethylamide, phencyclidine or any other controlled dangerous substance classified in Schedules I or II, or any controlled substance analog thereof, in violation of subsection a of N.J.S.[A.] 2C:35-5, is strictly liable for a death which results from the injection, inhalation or ingestion of that substance and is guilty of a crime of the first degree.

Addressing defendant's motion for judgment of acquittal, the trial judge noted the proof surrounding defendant's heroin distribution was circumstantial but denied the motion because the testimony Sung U died of a heroin overdose,

paired with evidence such as the "GUCCI" stamped wax papers, as well as the references to text messages where Fontana asked for the "same as last time," provided a sufficient link for a jury to find guilt.

Defendant was found with two bundles of heroin stamped "GUCCI" similar to the glassine bags found in Sung U's room. He was in possession of the phone that was used to communicate and conduct drug transactions with both Sung U and Fontana, operating under the guise that he was Sung U. Defendant's assertion that he did not receive the phone used to conduct the transactions until April 14 and he did not know Sung U or attempt to sell him drugs was eroded by the text messages between defendant and Fontana which referenced prior sales between defendant and Sung U.

Based on the circumstantial evidence presented, a reasonable jury had a substantial basis to conclude beyond a reasonable doubt that the drugs that led to Sung U's death were purchased from defendant.

## II.

Defendant asserts the trial court's decision to sentence him to a term above the statutory minimum was arbitrary and capricious as the court placed undue weight on aggravating factor N.J.S.A. 2C:44-1(a)(9), despite the court's findings regarding mitigation.

13

We reject defendant's excessive sentencing argument. The trial court sentenced defendant to an aggregate term of twelve years, subject to NERA.

We review a judge's sentencing decision under an abuse of discretion standard. State v. Pierce, 188 N.J. 155, 169-70 (2006); State v. Roth, 95 N.J. 334, 363-64 (1984). When reviewing a judge's sentencing decision, we "may not substitute [our] judgment for that of the trial court. . . ." State v. Johnson, 118 N.J. 10, 15 (1990) (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). However, we may review and modify a sentence when the judge's determination was "clearly mistaken." State v. Jabbour, 118 N.J. 1, 6 (1990) (quoting State v. Jarbath, 114 N.J. 394, 401 (1989)). A trial judge is given "wide discretion" to impose a sentence provided it is within the statutory framework, and we must give that decision "great deference." State v. Dalziel, 182 N.J. 494, 500-01 (2005). However, in determining the propriety of a sentence, we must make sure the sentencing guidelines have been met, the findings on aggravating and mitigating factors are based upon "competent credible evidence in the record," and the sentence is not "clearly unreasonable so as to shock the judicial conscience." Id. at 501 (quoting Roth, 95 N.J. at 364-65).

A-4572-17T3

The "dominant, if not paramount, goal" of N.J.S.A. 2C:44-1's aggravating and mitigating factors is "uniformity in sentencing." State v. Lawless, 214 N.J. 594, 607 (2013) (quoting State v. Kromphold, 162 N.J. 345, 352 (2000)).  To promote this goal, sentencing courts must "state . . . the factual basis supporting a finding of particular aggravating or mitigating factors," R. 3:21-4(g), and must "describe the balancing process leading to the sentence," State v. Kruse, 105 N.J. 354, 359-60 (1987).  "A careful statement of reasons also facilitates appellate review." State v. Fuentes, 217 N.J. 57, 74 (2014).

Based on our review of the judge's stated reasons, we discern no abuse of the court's discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION