# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1416-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

R.C.,

     Defendant-Appellant.

_____

> Argued October 28, 2025 – Decided December 29, 2025
>
> Before Judges Susswein and Augostini.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 21-06-0519.
>
> Lucas B. Slevin, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Lucas B. Slevin, of counsel and on the briefs).
>
> Nicole Handy, Assistant Prosecutor, argued the cause for respondent (LaChia L. Bradshaw, Burlington County Prosecutor, attorney; Nicole Handy, of counsel and on the brief).

PER CURIAM

Defendant R.C.[1] appeals from his guilty plea convictions of sexually assaulting two of his minor children. He also appeals from the imposition of an aggregate fifteen-year prison sentence and various fines and fees. Defendant admitted that while home alone with his three-year-old daughter and eighteen-month-old son, he placed honey on his penis and allowed the children to lick it off. The older toddler told her mother, defendant's wife, about the incident. Defendant admitted to what happened. At the urging of his wife and family pastor, defendant called 9-1-1 to report the incident to police.

Defendant contends that his statements to the 9-1-1 dispatcher and police officers should have been suppressed because he did not knowingly, voluntarily, and intelligently waive his Miranda[2] rights and also because his confession was involuntary. More specifically, he contends that police misled him into believing that he was "not in trouble" and that they were speaking with him only to help him obtain counseling.

---

[1] We identify defendant by his initials to protect the minor victims. See R. 1:38-3(c)(9).

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1416-23

After reviewing the record in light of the governing legal principles, we affirm the denial of defendant's suppression motion. None of the statements made by police, viewed separately or in combination, amount to an affirmative misrepresentation of defendant's legal predicament. Nor did police undermine the Miranda warnings, as defendant claims. Those warnings, by design, advised defendant that anything he told police would be used against him in a court of law. Neither the United States nor New Jersey Constitutions are offended when, as in this case, a defendant chooses to disregard the clear warning that there are penal consequences to self-incrimination. We likewise are unpersuaded by defendant's due process arguments regarding the voluntariness of his admissions. Accordingly, we affirm the convictions.

Defendant's sentencing arguments are also unpersuasive, for the most part. The trial court's findings on the aggravating and mitigating factors and its decision to impose consecutive sentences are supported by substantial credible evidence in the record. However, we deem it necessary to remand with respect to the imposition of the Sex Offender Supervision Fee (SOSF) and a Certain Sexual Offenders Surcharge. Because the trial court made only a generalized finding regarding defendant's financial condition, a limited remand is needed for the court to specifically find whether defendant is subject to the SOSF based on

3

whether his income exceeds the statutorily-prescribed minimum. Regarding the surcharge, the statute only allows for the imposition of one $100 penalty per disposition, not a $100 penalty for each count. We therefore also remand for the court to reduce the surcharge to $100. In all other respects, we affirm the sentence imposed.

## I.

We discern the following pertinent facts and procedural history from the record.

## A.

One evening in December 2019, defendant was sitting on the couch watching a movie with his daughter, age three, and son, age eighteen months. Defendant's daughter adjusted her position and brushed up against defendant's genital area. He became aroused. Defendant went to the kitchen pantry, put honey on his penis, and returned to the couch with his penis exposed. Defendant then allowed both children to lick the honey off his penis.

One or two days later, defendant's daughter told her mother, defendant's wife, about the incident. Defendant's wife promptly confronted defendant, and he admitted to her what had happened. At his wife's urging, defendant called the family pastor. During two telephone conversations with the pastor,

4

defendant asked for information about counseling services. Defendant did not, however, disclose to the pastor any details about the incident.

The next day, defendant's wife told the pastor that defendant had engaged in sexual misconduct involving her children. Shortly thereafter, the pastor called defendant and urged him to report the incident to the police.

The pastor accompanied defendant's wife to the Bordentown State Police Station to report the incident. State Police Detective Keith MacDonald interviewed defendant's wife and the pastor.

That same evening, defendant called 9-1-1 and asked the dispatcher if there was "anybody I can talk to about reporting something?" The dispatcher asked what he was trying to report, and defendant replied, "a mistake, sexual abuse." When the dispatcher asked whether it was something defendant did to someone or that someone did to him, defendant replied, "I did to someone." The dispatcher then asked:

> [Dispatcher]: And how old was the victim?
>
> [Defendant]: (sighs)
>
> [Dispatcher]: It's okay you can tell me.
>
> [Defendant]: I'm sorry (crying) a kid.
>
> [Dispatcher]: It's a kid?

A-1416-23

[Defendant]: It was my kid.

[Dispatcher]: Okay, I understand it's upsetting, but you're doing the right thing by coming forward with it.

The dispatcher proceeded to ask for defendant's name, the child's age, and the date of the incident. The dispatcher then asked:

[Dispatcher]: And you, you said your parent know[s] that you assaulted her?

[Defendant]: It's hard to hear you say assault I can't call it . . .

[Dispatcher]: I'm, I'm sorry, I'm sorry, I didn't mean that.

[Defendant]: I didn't, I didn't, I didn't . . . (crying)

[Dispatcher]: I'm sorry, okay well you know what, we're gonna get you some help[.]

After getting defendant's daughter's name, the dispatcher stated, "She's gonna be just fine and you know what, knowing that you came forward to get her help is gonna make her feel so much better about this." The dispatcher then informed defendant that she was going to transfer him to her supervisor and that "he's gonna help you get the best help for this situation."

The dispatcher proceeded to transfer the call to Sergeant Jason Matthews of the Brick Township Police Department. Matthews asked defendant, "what's going on?" to which defendant replied, "I just messed up I'm trying to come

6

forward and say that I . . . made a mistake and yeah, somehow I . . . sexually abused my daughter."

After getting defendant's name, Matthews stated, "[o]kay so . . . [w]hat we probably can do is . . . we'll talk to you in person . . . [a]nd try to work through everything."  Defendant replied, "[y]ou know I just I'm at my mom's [house and] I was hoping I could just stay here as long as it took to . . .get through counseling and [my wife is] not pressing charges I just wanna . . . make sure I can still work and provide for them."  Matthews told defendant that "I'm sure they'll be able to work that out.  That you being you know forthcoming and everything that will help."

Matthews then asked, "are you looking to come in here . . . ?" to which defendant replied, "Uh, it's kind of I wanted to talk to somebody and I wanted to see what the next step was."  Matthews asked defendant where the incident occurred and where defendant was presently located.  Mathews then asked:

> [Sgt. Matthews]:  I mean do you want to come down here or do you want you know?
>
> [Defendant]:  Well I don't know what the difference is. I'm, I'm afraid uh to be honest . . . I've never done anything like this before I'm afraid . . . I'll get locked up I'm afraid I'll spend the night you know . . . but I, I need to be strong and uh, nobody forced me to make this call.

A-1416-23

Shortly thereafter, the following exchange occurred:

> [Sgt. Matthews]: I mean it's up to you if you wanna come down here or you want us to come over there, you know?
>
> [Defendant]: Well what's the end result? I mean . . .
>
> [Sgt. Matthews]: You're gonna have to . . .
>
> [Defendant]: Are you gonna haul me or am I gonna have to you know like what's . . . ?
>
> [Sgt. Matthews]: I'm not familiar with the whole situation so . . .

Matthews told defendant that he would "make a couple calls" and then call defendant back. Matthews called Sergeant Iannacone of the New Jersey State Police to discuss the situation. The officers decided to ask defendant to come to the Holmdel State Police Station. They determined that Matthews, rather than Iannacone, would call defendant back because, as Iannacone stated, "if he gets a call from me he may get spooked."

Matthews called defendant back and explained that Wrightstown, where the incident occurred, "is actually handled by State Police . . . [s]o you would actually have to speak with them . . . in reference to the incident. Would you be able to go to their Holmdel Station . . . and they can talk to you over there?" Defendant replied, "Yeah, I mean if that's the next step that's the next step."

8

Matthews offered to call Holmdel Station and have them call defendant "and you can work it out with them." Defendant stated, "that's fine, that'll work."

Defendant drove to the Holmdel State Police station accompanied by his mother. They arrived at around 9:00pm. State Police Detective Craig McCoy met defendant in the lobby and escorted him to the interview room. The electronically recorded interrogation began at 9:18pm. Defendant and McCoy were the only people in the room throughout the interrogation, which lasted approximately one hour and forty-five minutes. The record shows that before speaking to defendant, McCoy had at least some knowledge about defendant's 9-1-1 call and the ongoing interviews of defendant's wife and the pastor.

McCoy read from a State Police <u>Miranda</u> form. After reading each right, McCoy asked defendant to confirm that he understood that right. The form was facing McCoy as he read from it. Defendant—who was sitting on the opposite side of the table—did not read along. While reading the fifth right,[3] McCoy stated, "I'm sorry, they changed the wording" and defendant asked McCoy to "say that again." McCoy proceeded to read the fifth right verbatim, and defendant stated that he understood.

---

[3] The fifth right reproduced on the form reads, "[a] decision to speak to us is not final and you may stop talking to us at any time."

A-1416-23

McCoy wrote defendant's name in the "Waiver of <u>Miranda</u> Rights" section and read the accompanying declaration aloud to defendant: "I have been read the above statements of your rights [aloud]. You understand each of your rights at this time and give up your rights to remain silent and speak to us without a lawyer present. No promises or threats have been given to you." McCoy turned the form towards defendant, handed him a pen, and said "[t]hat means I read you your rights and you sign there saying that I read them to you." Defendant looked at the form, which also included a Spanish translation of the waiver of rights, and asked, "[i]s that Latin?" McCoy noted that "they changed the form" and clarified that defendant could just sign at the top of the waiver section, where the English version was written. Defendant signed the form.

McCoy left the room to take a phone call, returned about a minute later, and explained that he had been on the phone with the detectives in Bordentown. McCoy then began questioning defendant. After gathering background information, including the names and dates of birth of defendant's three children, McCoy turned to the subject matter of the interrogation: "So . . . obviously we're here because there was an incident that was reported . . . why don't you just walk me through what, what you wanted to come clean with today." McCoy

10

added, "I want you to know there's no judgment here, you know . . . I think it's admirable that you're trying to do the right thing here."

Defendant said, "I screwed up and, you know, here we are," to which McCoy replied, "This is the first step to making it right." Defendant indicated that he hoped to seek counselling and to "talk to a psychiatrist."

McCoy then asked defendant to explain what "brought us to where we are today." Defendant began to explain his "struggle[s] with porn" and give some background information about his job, which had exacerbated the problem. As he began to describe the incident—but before providing any specific details—defendant stopped, and said:

> [Defendant]: [y]ou know, I'm scared [about] staying in jail and los[ing] my job and . . . the house and . . .
>
> [Det. McCoy]: [w]ell, let's, we're not there.
>
> [Defendant]: [I'm] definitely scared right now . . . just not showing it.

McCoy redirected defendant to resume explaining what happened on the evening in question. Defendant proceeded to recount the incident, but he initially indicated that only his daughter was involved and omitted the fact that he placed honey on his penis.

11

McCoy told defendant that his children, wife, and pastor were currently being interviewed at the Bordentown station, and remarked, "it was weird cause the initial call came in that you put something on your penis and had your daughter lick it off . . . . What was, uh, what happened with that?" Defendant then admitted that he had placed honey on his penis and that his son was also involved.

## B.

In June 2021, defendant was charged by indictment with two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); two counts of second-degree endangering the welfare of a child – sexual conduct, N.J.S.A. 2C:24-4(a)(1); two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); and one count of first-degree tampering with a witness, N.J.S.A. 2C:28-5(a)(1).

On September 22, 2022 and October 19, 2022, the trial court convened an evidentiary hearing on defendant's motion to suppress the statements he made to police. On October 19, 2022, the judge denied defendant's motion to suppress, rendering an oral opinion.

On January 17, 2023, defendant pled guilty pursuant to a negotiated plea agreement to the two counts of second-degree sexual assault, N.J.S.A. 2C:14-

12

2(b).[4]  On October 17, 2023, defendant was sentenced in accordance with the plea agreement to two consecutive terms of 7.5 years of imprisonment, each with an 85% period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.  The court also imposed Parole Supervision for Life pursuant to N.J.S.A. 2C:43-6.4 and ordered defendant to comply with Megan's Law reporting and registration requirements, N.J.S.A. 2C:7-1 to -23.  The court also imposed a $30 monthly "Sex Offender Supervision Fee" pursuant to N.J.S.A. 30:4-123.97, and a $200[5] "Certain Sexual Offenders Surcharge" pursuant to N.J.S.A. 2C:43-3.7.  The remaining charges were dismissed in accordance with the plea agreement.

This appeal follows.  Defendant raises the following contentions for our consideration in his appeal brief:

> POINT I
> SUPPRESSION IS REQUIRED BECAUSE THE STATE FAILED TO ESTABLISH BEYOND A REASONABLE DOUBT THAT THE DEFENDANT WAIVED HIS MIRANDA RIGHTS KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY.
>
> A. Before providing the Miranda warnings, the police intentionally deceived the Defendant into

---

[4]  As part of the negotiated guilty plea, defendant preserved the right to appeal the denial of his motion to suppress his incriminating statements.

[5]  The court applied a $100 surcharge for each conviction.

thinking that he was not in trouble.

B. During the formal reading of the <u>Miranda</u> warnings, the police gave inaccurate warnings and improperly minimized the significance of waiving <u>Miranda</u>.

C. After the Defendant signed the <u>Miranda</u> form, the police continued to contradict <u>Miranda</u> by implying that confessing could help rather than hurt the Defendant.

<u>POINT II</u>
THE STATE FAILED TO ESTABLISH BEYOND A REASONABLE DOUBT THAT THE DEFENDANT'S STATEMENT WAS MADE VOLUNTARILY BECAUSE THE POLICE MADE FALSE PROMISES OF LENIENCY AND IMPLIED THAT THE DEFENDANT WOULD NOT GO TO JAIL.

<u>POINT III</u>
RESENTENCING IS REQUIRED FOR SEVERAL REASONS.

A. Because the court failed to adequately consider the Yarbough factors, the imposition of consecutive sentences was erroneous.

B. The court's application of aggravating factor 3 was erroneous because it was not based upon any competent, credible evidence.

C. Because mitigating factors 8, 9, and 12 were all apparent in the record, the court's failure to apply those factors was erroneous.

14

D. The court imposed a penalty under N.J.S.A. 30:4-123.97 without considering the Defendant's ability to pay.

E. The Judgment of Conviction does not accurately reflect the sentence imposed by the Court.

Defendant raises the following additional contentions in his reply brief:

POINT I
BECAUSE POLICE INTENTIONALLY DECEIVED DEFENDANT INTO THINKING HE WAS NOT IN TROUBLE AND PROVIDED INADEQUATE MIRANDA WARNINGS, THE DEFENDANT'S MIRANDA WAIVER WAS NOT MADE KNOWINGLY OR INTELLIGENTLY.

A. Before reading the Miranda warnings, the police made intentionally deceptive and inaccurate assurances to the Defendant that gave him the false belief that [defendant] was not in trouble.

B. The Miranda warnings were insufficient because they advised Defendant that signing the waiver form meant only that his rights had been read to him and not that he had waived those rights.

C. After the Miranda warnings, the police continued to mislead Defendant as to the true consequences of confessing.

POINT II
RESENTENCING IS REQUIRED BECAUSE THE COURT FAILED TO ADEQUATELY EXPLAIN THE

OVERALL FAIRNESS OF THE CONSECUTIVE
SENTENCES, AS REQUIRED BY TORRES.[6]

## II.

We begin our analysis by acknowledging the legal principles governing this appeal. The scope of appellate review of a suppression hearing is limited. See State v. Handy, 206 N.J. 39, 44-45 (2011). We "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Id. at 44 (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "An appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

In State v. Hubbard, our Supreme Court explained:

> [W]hen the evidence consists of testimony of one or more witnesses and a videotaped recording of a statement by a witness or a suspect, an appellate court is obliged to review the entire record compiled in the trial court to determine if the factual findings are supported by substantial credible evidence in the record. State v. Locurto, 157 N.J. 463, 470–71 (1999). The appellate panel may reference a videotaped

---

[6] State v. Torres, 246 N.J. 246 (2021).

statement to verify a specific finding. It may not substitute its interpretation of events.

[222 N.J. 249, 269 (2015).]

See also State v. Hagans, 233 N.J. 30, 38 (2018) (noting "a trial court's fact-finding based solely on a video recording is disturbed only 'when factual findings are so clearly mistaken—so wide of the mark—that the interests of justice demand intervention.'") (quoting State v. S.S., 229 N.J. 360, 381 (2017)).

In contrast to the deference we owe to a trial court's factual and credibility findings, we review a trial court's legal conclusions de novo. S.S., 229 N.J. at 380. Because issues of law "do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law de novo—with fresh eyes—owing no deference to the interpretive conclusions of trial courts, unless persuaded by their reasoning." Ibid. (internal quotation marks omitted) (quoting State v. Morrison, 227 N.J. 295, 308 (2016)); see also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (noting that appellate courts are not bound by a trial court's interpretations of the "legal consequences that flow from established facts"). In the event of a mixed question of law and fact, we review a trial court's determinations of law de novo but will not disturb a court's factual findings unless they are "clearly erroneous." State v. Marshall, 148 N.J. 89, 185 (1997).

A-1416-23

## III.

Turning to substantive issues, the gravamen of defendant's argument is that his waiver of Miranda rights is invalid because police used what defendant characterizes as deceptive tactics that led him to waive his rights "under the false belief that he was not in trouble and that a confession would help him." More specifically, defendant argues that the police intentionally withheld information and made affirmative misrepresentations so that he would believe they were speaking with him "simply to help him obtain counseling."

Additionally, defendant argues that Detective McCoy provided inaccurate Miranda warnings and made statements that minimized the significance of those warnings. Relatedly, defendant claims that McCoy contradicted the Miranda warnings during the course of the interrogation "by suggesting that a confession could actually help [defendant]."

"[T]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically

18

triggering the Fifth Amendment privilege against self-incrimination." State v.

P.Z., 152 N.J. 86, 102 (1997) (citing Miranda, 384 U.S. 436). Consequently,

> when a person in police custody is questioned by law enforcement, he [or she] must be told that he [or she] has the right to remain silent, that any statement he [or she] makes may be used against him [or her], that he [or she] has the right to an attorney, and that if he [or she] cannot afford an attorney, one will be provided for him [or her].
>
> [Ibid. (citing Miranda, 384 U.S. at 444).]

It bears emphasis that the New Jersey Supreme Court affords interrogees

additional rights beyond those guaranteed under federal constitutional law. In

State v. Vincenty, our Supreme Court reaffirmed that the "[New Jersey] common

law privilege against self-incrimination affords greater protection to an

individual than that accorded under the federal privilege." 237 N.J. 122, 132

(2019) (quoting In re Grand Jury Proc. of Guarino, 104 N.J. 218, 229 (1986)).

The Court added:

> We have provided that protection because the right against self-incrimination is "an integral thread in the fabric of [the] common law," and "one of the most important protections of the criminal law[.]" Accordingly, we maintain "an unyielding commitment to ensure the proper admissibility of confessions."
>
> [Ibid. (quoting State v. Hartley, 103 N.J. 252, 286 (1986); then quoting State v. Presha, 163 N.J. 304, 312

19

(2000); and then quoting State v. Reed, 133 N.J. 237, 252 (1993)).]

Once Miranda warnings are properly administered, a defendant subject to custodial interrogation "may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly, and intelligently." State v. Tillery, 238 N.J. 293, 315 (2019) (quoting Miranda, 384 U.S. at 444). Under New Jersey's custodial interrogation jurisprudence, and consistent with our Supreme Court's commitment to afford protections beyond those guaranteed under federal law, for an incriminating statement obtained during a custodial interrogation to be admissible, "the prosecution [must] 'prove beyond a reasonable doubt that the suspect's waiver [of Miranda rights] was knowing, intelligent, and voluntary in light of all the circumstances.'" State v. A.M., 237 N.J. 384, 397 (2019) (quoting Presha, 163 N.J. at 313).

We evaluate whether the State has satisfied its burden of proof by considering the "totality of the circumstances." Tillery, 238 N.J. at 316 (quoting A.M., 237 N.J. at 398). In the totality-of-the-circumstances inquiry,

> the court considers all the facts surrounding the interrogation, including "the defendant's age, education and intelligence, advice as to constitutional rights, length of [the] detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Nyhammer, 197 N.J. at 402 (quoting Presha, 163 N.J.

at 313). Courts will also consider a defendant's prior experience (or lack thereof) with the criminal justice system. State v. L.H., 239 N.J. 22, 43 (2019) Those factors are assessed "qualitatively, not quantitatively." State v. Hreha, 217 N.J. 368, 384 (2014). The inquiry also considers statements and behaviors by the police which tend to contradict the Miranda warnings, or otherwise render them ineffective. See, e.g., L.H., 239 N.J. at 43-44.

[State v. Erazo, 254 N.J. 277, 301 (2023) (citations reformatted).]

IV.

We next apply these general principles to the matter before us. Defendant argues that statements by both the 9-1-1 dispatcher and Sergeant Matthews rendered defendant's ensuing Miranda waiver involuntary.

A.

We first consider the role played by the 9-1-1 dispatcher. As a threshold issue, we are not persuaded by the State's argument that the dispatcher's statements are not relevant to the Miranda inquiry because she is not a law enforcement officer. We agree with defendant that the Miranda waiver and voluntariness analysis is not categorically restricted to reviewing the conduct of law enforcement officers. Case law refers more generally to "governmental compulsion to disclose information that would tend to incriminate [a person.]" State v. Patton, 133 N.J. 389, 395-96 (1993) (emphasis added). Thus, for

21

example, in Mathis v. United States, 391 U.S. 1, 3-4 (1968), the Court held that an IRS agent was required to administer Miranda warnings before eliciting potentially inculpatory tax information from a man serving a state prison sentence at the time. In State v. J.P.B., 143 N.J. Super. 96, 103-05 (App. Div. 1976), we held that a juvenile counselor, "having gone to the police and thereafter having questioned [the defendant] at [the police's] request, had become an agent of the police and was therefore required prior to questioning [the defendant] to give him the Miranda warnings." We add that in State v. Scott, 474 N.J. Super. 388 (App. Div. 2023), a case involving a claim of racial targeting, we more recently acknowledged that the actions of a dispatcher can be attributed to law enforcement for purposes of establishing a prima facie case of unlawful discrimination. Id. at 407-08.

Because our Miranda waiver inquiry looks at the "totality" of the circumstances, Tillery, 238 N.J. at 316, we consider the dispatcher's conduct as part of our analysis of whether defendant was misled with respect to his Miranda rights. That said, we emphasize at the outset that defendant was not in custody when he called 9-1-1 and spoke to the dispatcher.

Defendant focuses on three occasions where, he contends, the dispatcher improperly encouraged defendant to confess or else misled defendant into

believing that he was "not in trouble" and that his admissions would lead to treatment rather than punishment

First, the dispatcher stated "Okay, I understand it's upsetting, but you're doing the right thing by coming forward with it." Second, when the dispatcher referred to the incident as an "assault," defendant objected: "[i]t's hard to hear you say assault." The dispatcher then stated, "I'm sorry, I didn't mean that," and when defendant began to cry, the dispatcher said, "I'm sorry . . . we're gonna get you some help." Finally, before transferring the call to Matthews, the dispatcher stated that Matthews would "get [defendant] the best help" for "this situation" and for defendant and his daughter.

Defendant argues these statements were tantamount to affirmative misrepresentations that undermined Miranda. We are unpersuaded. As we have noted, defendant was on the phone, not in custody, when the dispatcher made these statements, and their effect on the voluntariness of his Miranda waiver later that night was attenuated not only by the passage of time, but by the Miranda warnings that prefaced the custodial interrogation.

Furthermore, defendant's reliance on State v. Bullock, 253 N.J. 512 (2023), L.H., and State v. O.D.A.-C., 250 N.J. 408 (2022), is misplaced. The dispatcher's statements are easily distinguished from the misleading

23

representation in <u>Bullock</u> and the repeated false promises in <u>L.H.</u> and <u>O.D.A.-C.</u>

In <u>Bullock</u>, the suspect admitted in the course of an attempted murder investigation that he made statements about harming two people. Before continuing to question him, the interrogating officer said, "[l]ook before any of this goes anywhere else right now, you are not under arrest. You are not in trouble. I'm going to advise you of your <u>Miranda</u> rights, ok?" 253 N.J. at 539. Our Supreme Court held that this statement undermined the defendant's subsequent <u>Miranda</u> waiver, because "under those circumstances, defendant was in some peril" and telling him he was "not in trouble" was "an affirmative misrepresentation." <u>Ibid.</u>

In the present matter, the dispatcher's statements to defendant are readily distinguishable from the officer's conduct in <u>Bullock</u>. In <u>Bullock</u>, the officer affirmatively—and falsely—stated that the defendant was "not in trouble." Here, the dispatcher never stated that defendant would not face any penal consequences. We thus conclude the dispatcher did not affirmatively mislead defendant.

Nor did the dispatcher's comment that Sergeant Matthews would "get [defendant] the best help" somehow suggest that police would not be

24

investigating the serious crime to which he was admitting. Defendant's reliance on L.H. and O.D.A.-C. is misplaced. L.H. involved the interrogation of a defendant suspected of sexual assault. 239 N.J. at 28. Over the course of a three-hour interrogation, the detectives "repeatedly promised [the] defendant counseling, indicating that he would not go to jail if he cooperated;"[7] told the defendant that telling the truth would be helpful to him and would "set him free;" and "repeatedly minimized the nature and gravity of the defendant's alleged offenses—intimating that his conduct was amenable to counseling and rehabilitation." Id. at 28, 48.

In O.D.A.-C., the detective

> twice told defendant the [Miranda] warnings were a "formality." He promised the defendant's words were "confidential between us" and would "stay[ ] between us." He assured defendant his words were "not going to work against you." And he told defendant "[a]nything you say . . . is only going to help you; it's not going to hurt you."
>
> [250 N.J. at 423.]

---

[7] For example, one of the detectives said, "[W]e're gonna help you out. You need some counseling." Later, when the defendant asked, "the help I need is not sending me to jail is it?" the detective replied, "Not at all. Nobody gets rehabilitated in jail." Id. at 48.

Here, the dispatcher's comments that defendant was "doing the right thing by coming forward" and that Matthews would "get [defendant] the best help" simply do not rise to the level of the repeated, explicit assurances made in L.H. and O.D.A.-C.

B.

We turn next to the comments made by Sergeant Matthews. Defendant argues that Matthews failed to inform defendant of his "suspect status" and falsely assured defendant that confessing would help him.

In support of his contention that Matthews violated his rights by failing to inform defendant he was a suspect in a criminal investigation, defendant points to this exchange that occurred during the phone conversation before defendant drove himself to the State Police station:

> [Sgt. Matthews]: I mean it's up to you if you wanna come down here or you want us to come over there, you know?
>
> [Defendant]: Well what's the end result? I mean . . .
>
> [Sgt. Matthews]: You're gonna have to . . .
>
> [Defendant]: Are you gonna haul me or am I gonna have to you know like what's. . . ?
>
> [Sgt. Matthews]: I'm not familiar with the whole situation so . . .

A-1416-23

Defendant's contention is flawed, factually and legally. Our Supreme Court in State v. Sims made clear that police are under no obligation to tell an interrogee that they are a suspect. 250 N.J. 189, 214 (2022). Rather, the obligation to advise an interrogee arises when a complaint-warrant has been filed. Id. at 214-17. But even accepting that Matthews's "feigned ignorance," to use defendant's characterization, should be considered as part of the totality of the circumstances, we are unpersuaded that Matthews's reply undermined defendant's Miranda rights. For one thing, Matthews did not have any information that defendant lacked. Cf. State v. Diaz, 470 N.J. Super. 495 (App. Div. 2022) (holding Miranda waiver involuntary where police strategically declined to reveal that interrogee's heroin sale had led to an overdose death, which interrogee did not know). Defendant is hard pressed to argue he did not believe he was a suspect in the crime that he had already confessed to.

Furthermore, Matthews's assertion that he was "not familiar with the whole situation" was, in substance, true. And finally, at the risk of repetition, this conversation occurred via phone. Defendant was not in custody.

We likewise reject defendant's contention that Matthews made false assurances to defendant that undermined his rights against self-incrimination.

Specifically, defendant argues that Matthews made a false assurance in the following exchange:

> [Defendant]: [y]ou know I just I'm at my mom's [house and] I was hoping I could just stay here as long as it took to, to, to get through counseling and [my wife is] not pressing charges I just wanna . . . I just wanna make sure I can still work and provide for them.
>
> [Sgt. Matthews]: I'm sure they'll be able to work that out. That you being you know forthcoming and everything that will help.

Defendant argues that Matthews's response falsely "assured [defendant] that returning home after confessing was a likely possibility" and that his confession would not be used against him. Citing to L.H. and dicta in State v. Francisco, 471 N.J. Super. 386, 419 (App. Div. 2022), defendant argues that these statements undermined his ensuing Miranda waiver. But like the dispatcher's statements—and quite unlike the detectives' assertions in L.H.—Matthews's reply does not constitute an affirmative representation that defendant will not face criminal charges or penal consequences.

Nor are we persuaded by defendant's argument that Matthews's and Sergeant Iannacone's decision to have Matthews, rather than Iannacone, call defendant back was "bad faith conduct" that further undermined the eventual waiver. Defendant asserts that this choice was analogous to the "investigative

28

stratagem" in <u>Diaz</u>, where the police "carefully orchestrated" the information provided to the defendant in order to "affirmatively and deliberately mislea[d] [the] interrogee as to why he or she is being interrogated."  470 N.J. Super. at 518-20; <u>see also</u> <u>State v. Cotto</u>, 471 N.J. Super. 489, 521 n.11 (characterizing police conduct in <u>Diaz</u>).  But here, in stark contrast to the situation in <u>Diaz</u>, the "strategic decision" not to "spook" defendant did not affirmatively mislead defendant with a deceptive omission like the one in <u>Diaz</u>.[8]  We see nothing inappropriate in the decision to have one officer, rather than another, return defendant's call.

V.

We next address defendant's contention that Detective McCoy administered "inaccurate" <u>Miranda</u> warnings and that McCoy made statements that minimized the significance of <u>Miranda</u>.

<u>Miranda</u> "establish[es] a per se rule in the sense that the failure by police interrogators to deliver any of the required warnings/advisements automatically results in the suppression of an ensuing statement."  <u>Diaz</u>, 470 N.J. Super. at 517 (citations omitted).  While <u>Miranda</u> "does not require that any specific language

---

[8] In <u>Diaz</u>, the police strategically withheld from the defendant that the person to whom he had distributed drugs the day before had died of an overdose.  470 N.J. Super. at 503.

be used to inform an accused of [their] rights," deviation from the words of the Miranda opinion is strongly discouraged. State v. Melvin, 65 N.J. 1, 14 (1974). Cf. State v. Sims, 466 N.J. Super. 346, 385-86 (App. Div. 2021) (Susswein, J.A.D., dissenting) ("One of the hallmarks of Miranda and its progeny is that the familiar five-fold warnings/advisements are essentially scripted. They are not tailored based on subjective determinations made by interrogating officers." (footnote omitted)), rev'd and remanded, 250 N.J. 189, 271 (2022).

"[A] police officer cannot directly contradict, out of one side of [their] mouth, the Miranda warnings just given out of the other." O.D.A.-C., 250 N.J. at 420-21 (quoting L.H., 239 N.J. at 44). Likewise, telling a suspect that the Miranda warnings are a mere "formality" tends to "downplay[] their significance" and weighs against a finding of waiver. O.D.A.-C., 250 N.J. at 422. See also Tillery, 238 N.J. at 319 (police "should scrupulously avoid making comments that minimize the significance of the suspect's" waiver of Miranda rights).

A.

Defendant argues that McCoy's warnings were inaccurate because, after reading the waiver form verbatim, McCoy turned the form around for defendant to sign, stating, "[t]hat means I read you your rights and you sign there saying

that I read them to you." Defendant argues that this advisement was defective because it indicated defendant was only acknowledging that his rights had been read to him, not that he was waiving them. However, defendant's argument takes McCoy's statement out of context. Immediately before making that comment, McCoy finished reading the waiver form, including the acknowledgement that "you understand each of your rights at this time <u>and give up your rights to remain silent and speak to us without a lawyer present</u>" (emphasis added). This situation is very different from the one in <u>Tillery</u>, the case defendant relies on. Importantly, in <u>Tillery</u>, both the detective's statement ("[j]ust sign here that I read you your rights") and the waiver form itself failed to clearly advise the suspect that he was waiving his rights. 238 N.J. at 306, 318. Here, McCoy read verbatim from an updated version of the <u>Miranda</u> form—one that addressed the flaw in the predecessor form criticized in <u>Tillery</u>.

B.

Defendant also argues that when he asked a clarifying question before signing the form, McCoy's response improperly minimized the significance of the warnings, as McCoy failed to "ensure that defendant's confusion was, in fact, limited to the inclusion of Spanish on the form." Viewing the situation in context, however, we are satisfied that both defendant and McCoy were referring

31

only to the Spanish portion of the form. Importantly, moreover, the trial court found that "[the Miranda form] was gone over and read to [defendant], that he looked it over before he signed" and that "the officer and defendant went through the questions and the officer properly recorded the answers." That finding is supported by substantial credible evidence. See Hubbard, 222 N.J. at 269.

## VI.

We next address defendant's contentions that McCoy violated defendant's Miranda rights during the course of the interrogation itself. Defendant argues, for example, that after he signed the Miranda form, McCoy contradicted the warnings by implying that confessing would help defendant, rather than hurt him. Specifically, defendant argues McCoy made multiple statements suggesting that a confession would only result in counseling, not prison.

In O.D.A.-C., our Supreme Court stressed that "[c]omments that contradict and hollow out Miranda warnings can negate their effectiveness and cast doubt on whether a defendant fully understood and knowingly waived [their] rights." 250 N.J. at 423. An officer might contradict Miranda by "telling suspects that confessing 'could not hurt' and 'could only help' them," ibid., or by making "false promises of leniency that, under the totality of circumstances, have the capacity to overbear a suspect's will." L.H., 239 N.J. at 44 (citing

32

<u>Hreha</u>, 217 N.J. at 383).  Additionally, as we have already discussed, an officer may not "affirmative[ly] misrepresent" that a defendant is "not in trouble." <u>Bullock</u>, 253 N.J. at 539.

That said, the law is also long settled that because a suspect may have a natural reluctance to confess to criminal activity, an officer may attempt "to dissipate this reluctance and persuade the [suspect] to talk," including by "[a]ppealing to [the suspect's] sense of decency and urging [them] to tell the truth for [their] own sake."  <u>State v. Miller</u>, 76 N.J. 392, 403-05 (1978).

Applying these legal principles to the present matter, we consider defendant's contention that McCoy made an affirmative misrepresentation about the likelihood that defendant would go to prison.  As defendant began to discuss the sexual assault incident—but before providing any specific details—he stopped, and said:

> [Defendant]:  [y]ou know, I'm scared [about] staying in jail and los[ing] my job and . . . the house and . . .
>
> [Det. McCoy]:  <u>[w]ell, let's, we're not there</u>.
>
> [Defendant]:  [I'm] definitely scared right now . . . just not showing it.
>
> [(Emphasis added).]

McCoy then redirected defendant to the events in question, stating "[so] you're home[,] you're doing work," at which point defendant resumed his narrative.

Defendant characterizes McCoy's statement—"we're not there"—as an affirmative misrepresentation, arguing it

> was simply not true. [Defendant] was the only suspect in a sexual assault investigation; he had already admitted to committing sexual abuse; the allegation had been corroborated by his wife; and he was being subjected to a custodial interrogation by a senior detective in the police station's interrogation room. . . . The police were unquestionably at a point where [defendant's] actions could result in a conviction and imprisonment—as indeed they did.

We have little doubt that McCoy was aware by that point that defendant's self-admitted misconduct with his children could result in prosecution, conviction, and imprisonment. But McCoy's words—"we're not there"—do not in our view constitute an affirmative misrepresentation that somehow undermined defendant's waiver of his right against self-incrimination or was otherwise inappropriate, warranting judicial condemnation. We reach this conclusion by comparing McCoy's off-hand remark with the problematic interrogator statements made in the cases defendant relies upon. In Bullock, the officer told an attempted-murder suspect who had just admitted he made statements about harming two people, "you are not in trouble." 253 N.J. at 539.

In L.H., when the defendant asked, "the help I need is not sending me to jail is it?" the detective replied, "Not at all. Nobody gets rehabilitated in jail." 239 N.J. at 48. In O.D.A.-C., the officer assured the defendant his words were "not going to work against you," and told the defendant "[a]nything you say . . . is only going to help you; it's not going to hurt you." 250 N.J. at 423.

By comparison, McCoy's remarks are innocuous. Furthermore, the trial judge, after observing McCoy's demeanor and tone in the video recording, found that, at this moment in the interrogation, defendant was "not prodded or prompted" to speak.

Defendant also claims that McCoy impermissibly reinforced defendant's belief that he could get counseling by confessing. But none of McCoy's statements support the notion that he misled defendant into believing that his admissions were not incriminating and would not lead to punishment. As we have noted, under longstanding New Jersey law, McCoy was permitted to "[a]ppeal[] to [defendant's] sense of decency and urg[e] him to tell the truth for his own sake." Miller, 76 N.J. at 405 (emphasis added).

## VII.

We need only briefly address defendant's contention that, aside from violating Miranda, police violated his right to due process. In P.Z., our Supreme

Court recognized that while "Miranda established a per se rule to counteract the inherently coercive nature of custodial interrogations by law enforcement[,] it did not eliminate the due process requirement that all statements given during an interrogation must be voluntary." 152 N.J. at 113 (citing Miller v. Fenton, 474 U.S. 104, 109-10 (1985)). Applying a "totality of the circumstances" analysis, both federal and New Jersey precedents require reviewing courts to consider whether the defendant's statements were "the product of an essentially free and unconstrained choice by [the defendant]," or instead "whether the defendant's 'will [was] overborne and [their] capacity for self-determination critically impaired.'" P.Z., 152 N.J. at 113 (quoting Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991), and Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

Our Supreme Court has recognized that the totality-of-the-circumstances test shares "'a substantial overlap [with] the factors that' apply to a [Miranda] waiver analysis." O.D.A.-C., 250 N.J. at 421 (quoting Tillery, 238 N.J. at 316-17). In this instance, defendant does not point to any additional circumstances with respect to his due process argument that were not raised in his Miranda-waiver arguments. We thus conclude that the reasons for rejecting defendant's Miranda contentions set forth in the preceding sections also support the

36

conclusion that the State proved beyond a reasonable doubt that defendant's confession was voluntary. To the extent we have not specifically addressed any of defendant's arguments relating to the admissibility of his statements, it is because they lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

VIII.

We proceed to discuss defendant's contentions that the trial court erred in imposing sentence. We begin by acknowledging that "[a]ppellate courts review sentencing determinations in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). The reviewing court must not substitute its judgment for that of the sentencing court. State v. O'Donnell, 117 N.J. 210, 215 (1989). Accordingly, the sentence must be affirmed unless:

> (1) [T]he sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Stated another way, we may modify a defendant's sentence only when convinced that the sentencing judge was clearly mistaken. State v. Johnson, 118 N.J. 10, 15 (1990); State v. Jabbour, 118 N.J. 1, 6 (1990).

A.

Defendant argues that the trial court erred in imposing consecutive sentences by failing to adequately consider the relevant factors. In <u>State v. Yarbough</u>, our Supreme Court provided guidance for determining whether to impose consecutive sentences, holding:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous;

A-1416-23

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.

[100 N.J. 627, 643-44 (1985), modified, State v. Torres, 246 N.J. 246 (2021).]

The Yarbough guidelines leave "a fair degree of discretion in the sentencing courts." State v. Carey, 168 N.J. 413, 427 (2001). Notably, "a sentencing court may impose consecutive sentences even though a majority of the Yarbough [factors] support concurrent sentences." Id. at 427-28.

The Court elaborated on those guidelines in Torres, explaining that "Yarbough's second factor requires a sentencing court to place on the record its statement of reasons for the decision to impose consecutive sentences, which . . . we have directed, should focus 'on the fairness of the overall sentence, and the sentencing court should set forth in detail its reasons for concluding that a particular sentence is warranted.'" 246 N.J. at 267-68 (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

A-1416-23

Here, the trial judge offered the following explanation for his decision to run the sentences consecutively:

> The consecutive nature of the sentence is . . . supported by the agreed upon disposition, recognizing that there were two separate [victims], recognizing that according to State v. Yarbough, the defendant does not have himself entitled to a free crime. These were separate, even [though] they incurred at the same time, these were separate crimes on two different victims with great harm to those victims based on defendant's acts.
>
> . . . .
>
> The Court finds that the sentence . . . is . . . consistent with . . . State v. Yarbough, and meets the Yarbough factors . . . and, also, pursuant to a more recent case, State v. Torres . . . [t]here is overall . . . fairness in the entire sentence considering the nature of the crimes, weighing the aggravating and mitigating factors and the totality of the entire event as the Court has indicated in its previous comments that the sentence is fair.

Furthermore, in its thorough discussion of the aggravating and mitigating factors, the trial court explained why these were "particularly egregious" crimes considering the potential lifelong impact on each victim.

Defendant correctly observes that only Yarbough factor (3)(d) (multiple victims) supports consecutive sentencing. However, given the trial judge's finding of suffering and long-term injury to each victim—and in light of the discretionary and qualitative nature of the sentencing determination—we are

40

satisfied the judge provided an adequate statement of reasons for imposing consecutive sentences. We note the plea agreement expressly contemplated consecutive sentences. See State v. Bell, 250 N.J. 519, 542 (2022) ("'[A] sentence imposed pursuant to a plea agreement is presumed to be reasonable . . .'") (quoting Fuentes, 217 N.J. at 70-71). Importantly, moreover, the trial court gave a separate and substantial explanation for its determination that the overall sentence was fair. See Torres, 246 N.J. at 268. We are satisfied the aggregate sentence imposed does not shock the judicial conscience. Id. at 272 (citing Roth, 95 N.J. at 364-65).

## B.

Defendant further argues that the trial judge erroneously applied the aggravating and mitigating factors. It is well-established that the consideration of aggravating and mitigating factors must be part of the deliberative process at sentencing. State v. Dalziel, 182 N.J. 494, 505 (2005); State v. Cassady, 198 N.J. 165, 180 (2009). Trial courts must "explain and make a thorough record of their findings to ensure fairness and facilitate review." State v. Comer, 249 N.J. 359, 404 (2022). "'Proper sentencing thus requires an explicit and full statement of aggravating and mitigating factors and how they are weighed and balanced.'" State v. McFarlane, 224 N.J. 458, 466 (2016) (quoting State v. Randolph, 210

41

N.J. 330, 348 (2012)); See also State v. Case, 220 N.J. 49, 66 (2014) ("[C]ritical to the sentencing process and appellate review is the need for the sentencing court to explain clearly why an aggravating or mitigating factor presented by the parties was found or rejected and how the factors were balanced to arrive at the sentence.").

Here, the trial court applied aggravating factors one, N.J.S.A. 2C:44-1(a)(1) ("[t]he nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in an especially heinous, cruel, or depraved manner"); two, N.J.S.A. 2C:44-1(a)(2) ("[t]he gravity and seriousness of harm inflicted on the victim, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance"); three, N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that the defendant will commit another offense"); and nine, N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law").

The court also applied mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) ("[t]he defendant has no history of prior delinquency or criminal activity or has

42

led a law-abiding life for a substantial period of time before the commission of the present offense").

The court concluded the aggravating factors substantially outweighed the mitigating factors.

Defendant first argues the judge mistakenly applied aggravating factor three because the offense was not premeditated, defendant was consistently remorseful, the Adult Diagnostic and Treatment Center (ADTC) report found no clear evidence of "compulsive sexual behavior," and defendant had no criminal record.

"[T]he absence of a criminal record will not preclude application of aggravating factor three so long as it is supported by other credible evidence in the record." State v. Rivera, 249 N.J. 285, 300 (2021) (citing Case, 220 N.J. at 67). When a court applies aggravating factor three and mitigating factor seven (no history of prior criminal activity), it "must 'explain how it reconciles those two findings' by providing greater detail as to the weight assigned to each aggravating and mitigating factor and how those factors are balanced with respect to the defendant." Id. at 301 (quoting Case, 220 N.J. at 81).

Although the trial court's explanation was concise, we are satisfied the application of aggravating factor three is supported by substantial credible

evidence in the record. We note that some of defendant's comments deflect responsibility for the incident onto his children. For example, he described his daughter as "curious" and even suggested that she initiated the sexual contact. Finally, the ADTC report, while concluding there was no "clear finding of compulsive sexual behavior," also concluded that "defendant's conduct in the present offense is cause for concern. It is recommended [defendant] participate in general psychotherapy to address the factors that contributed to his conduct." In these circumstances, the trial court was not clearly mistaken in finding that defendant might reoffend. Johnson, 118 N.J. at 15; Jabbour, 118 N.J. at 6.

Defendant also argues that the trial judge erred by failing to apply mitigating factors eight, N.J.S.A. 2C:44-1(b)(8) ("[t]he defendant's conduct was the result of circumstances unlikely to recur"); nine, N.J.S.A. 2C:44-1(b)(9) ("[t]he character and attitude of the defendant indicate that the defendant is unlikely to commit another offense"); and twelve; N.J.S.A. 2C:44-1(b)(12) ("[t]he willingness of the defendant to cooperate with law enforcement authorities").

Defendant argues that the failure to apply mitigating factors eight and nine "was erroneous for the same reason that application of aggravating factor [three] was erroneous." We agree with defendant that these arguments overlap, and

reject his arguments relating to these mitigating factors for the same reasons we were unpersuaded by his arguments with respect to aggravating factor three.

Regarding mitigating factor twelve, defendant argues this factor should have applied because defendant "cooperate[d] by confessing." We note, however, that defendant's confession only incriminated himself; he did not cooperate in the investigation or prosecution of another. See State v. Read, 397 N.J. Super. 598, 613 (App. Div. 2008) ("[W]e question whether a confession qualifies as 'cooperation' within the intent of [N.J.S.A. 2C:44-1(b)(12)], at least in the absence of any indication the confession identified other perpetrators or assisted in solving other crimes."). Defendant identifies no published authority holding that a self-incriminating confession constitutes a mitigating circumstance. We also note that defendant claims his confession was involuntary.

Finally, we reiterate that defendant's aggregate fifteen-year prison sentence is in accordance with the negotiated plea agreement. See Bell, 250 N.J. at 542.

IX.

We last address defendant's contentions with respect to the monetary sanctions. The trial court imposed a $30 monthly "Sex Offender Supervision

Fee" (SOSF) pursuant to N.J.S.A. 30:4-123.97 and a $200[9] "Certain Sexual Offenders Surcharge" pursuant to N.J.S.A. 2C:43-3.7. Defendant challenges both the supervision fee and the surcharge.

The SOSF was imposed pursuant to N.J.S.A. 30:4-123.97, which provides that "[a] person shall not be assessed the penalty . . . if the person's income does not exceed 149 percent of the federal poverty level." N.J.S.A. 30:4-123.97(b). Here, we are constrained to remand because the trial court made no specific finding with respect to whether defendant's income exceeds that statutorily-prescribed minimum threshold.

We are not persuaded by the State's argument that the trial court adequately considered defendant's ability to pay when it considered defendant's financial resources in imposing a different fine—the Sex Crime Victim Treatment Fund (SCVTF) penalty, N.J.S.A. 2C:14-10. In determining the SCVTF penalty, the trial court found that defendant had "limited ability to pay," and assessed an SCVTF penalty of $400. The court reached that number based on a colloquy with defendant regarding his financial resources, so as to comply

---

[9] The court applied a $100 surcharge for each of the two convictions.

with N.J.S.A. 2C:44-2 (requiring the court to take a defendant's financial resources into account when determining the amount of a fine).

Unlike N.J.S.A. 2C:44-2, however, the SOSF statute sets a specific income threshold (149 percent of the federal poverty level). Therefore, the court's generalized finding that defendant had "limited ability to pay" was not adequate to establish defendant's income for purpose of the SOSF. We therefore remand for the trial court to determine whether defendant's income exceeds the SOSF threshold of 149 percent of the federal poverty level.

Defendant also challenges the Certain Sexual Offenders Surcharge under N.J.S.A. 2C:43-3.7. We agree with defendant that under that statute the court should only have assessed a single $100 penalty.

N.J.S.A. 2C:43-3.7 provides: "In addition to any other penalty, fine or charge imposed pursuant to law, a person convicted of an act of aggravated sexual assault or sexual assault under N.J.S.A. 2C:14-2 . . . shall be subject to a surcharge in the amount of $100." We are satisfied that the penalty only applies once per disposition, not per conviction. We note that in contrast to several

47

other provisions imposing fines under N.J.S.A. 2C:43-3,[10] N.J.S.A. 2C:43-3.7 does not specify that the fine is to apply to each conviction.

Furthermore, we have held that the Law Enforcement Officers Training and Equipment Fund Penalty, N.J.S.A. 2C:43-3.3, which, like the Certain Sexual Offenders Surcharge provision, does not specify that the penalty is to be applied for each offense, may only be assessed once per disposition. State v. Owens, 381 N.J. Super. 503, 515 (App. Div. 2005). Accordingly, we remand to the trial court to reduce the surcharge to $100.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

---

[10] See, e.g., N.J.S.A. 2C:43–3.1(a)(1) (providing that "any person convicted of [certain automobile offenses] shall be assessed at least $100 but not to exceed $10,000 for each crime for which the person was convicted ") (emphasis added); N.J.S.A. 2C:43–3.1(2)(a) (providing for a $50 penalty "for each such offense or crime for which the person was convicted"); N.J.S.A. 2C:43–3.2 (providing for a Safe Neighborhoods Services Fund assessment "for each conviction"); N.J.S.A. 2C:43–3.5 (providing for a penalty to be assessed "for each adjudication or conviction"); N.J.S.A. 2C:43–3.6 (providing for a penalty "for each such offense").